[Civ. No. 1576. Third Appellate District.—November 13, 1916.]

## RAUER'S LAW & COLLECTION COMPANY, Appellant, v. A. J. HARRELL, Respondent.

ACTION UPON NOTES—CONDITIONAL LIABILITY—ISSUANCE OF BONDS.—In this action to recover on two promissory notes given to a corporation, it is held that the evidence was sufficient to justify the jury in concluding that liability on the notes was conditioned upon the tender or delivery of certain bonds of the corporation, which the defendant had undertaken to "underwrite," and that such bonds were not tendered or delivered because the stockholders of the corporation holding two-thirds of the subscribed or issued capital stock had not filed with the secretary their written assent to their issuance as required by subdivision 5 of section 359 of the Civil Code.

ID.—LACK OF CONSENT OF STOCKHOLDERS TO BOND ISSUE—BURDEN OF PROOF.—In such an action, where it is claimed that the defendant, who was a director, stockholder, and secretary of the corporation, prevented the securing of the consent of the required number of stockholders to the bond issue, the burden is upon the plaintiff to show affirmatively such contention.

ID.—CONTRACT—RENUNCIATION—TREATMENT AS BREACH.—In order to justify the adverse party in treating the renunciation of a contract as a breach, the refusal to perform must be of the whole contract or of a covenant going to the whole consideration, and must be distinct, unequivocal, and absolute.

ID.—ELECTION OF ADVERSE PARTY ESSENTIAL.—The renunciation of a contract itself does not *ipso facto* constitute a breach, but only becomes so when treated as such by the adverse party.

ID.—RECOVERY ON NOTES — AUTHORIZED ISSUANCE OF BONDS — PREVEN-
TION BY DEFENDANT—INSTRUCTION.—In such an action, an instruc-
tion that if the issuance of the bonds was never authorized, the
plaintiff could not recover, is not erroneous, as failing to submit
defendant's alleged conduct in preventing the corporation from issu-
ing the bonds, in the absence of substantial evidence of such alleged
conduct.

ID.—PRESUMPTION OF CONSIDERATION FOR NOTES—WEAKNESS OF EVI-
DENCE—INSTRUCTION.—An instruction that the presumption that a
consideration passed for the execution of the notes, being a dis-
putable one, was the weakest and least satisfactory evidence, while
erroneous, is not prejudicial, where the fact was admitted out of
which the presumption arose, namely, that the defendant executed
the notes.

ID.—PRESUMPTIONS AS EVIDENCE.—Presumptions, although disputable,
have such force as may, in some instances, outweigh positive evidence
against them, and sometimes require clear and convincing evidence
to overcome them.

ID.—SALARY OF DEFENDANT AS SECRETARY OF CORPORATION—IMMATERI-
ALITY AS TO CONSIDERATION OF NOTES—INSTRUCTION.—In such an
action, it is not error to instruct the jury that the fact that the
defendant was paid a salary for his services as secretary of the
corporation, constituted no consideration for the notes, in the ab-
sence of any evidence indicating that his salary in any way induced
him to make the notes.

APPEAL from a judgment of the Superior Court of Tulare
County. J. A. Allen, Judge.

The facts are stated in the opinion of the court.

Wm. Tomsky, and A. H. Jarman, for Appellant.

Farnsworth & McClure, and James M. Burke, for Re-
spondent.

CHIPMAN, P. J.—Plaintiff brought the action to recover
judgment on two promissory notes. In the first cause of action
it is alleged that defendant made and executed his promissory
note for the sum of thirty-four thousand dollars at the city
and county of San Francisco, dated September 22, 1913,
payable on January 2, 1914, to the order of the maker at
the Savings Bank & Trust Company of San Francisco; that
at said time and place defendant indorsed said note and de-
livered the same to the Pacific Coast Salt Company; that

thereafter and prior to the commencement of this action and after the maturity of said note, the said Pacific Coast Salt Company "assigned said claim and demand to plaintiff who ever since has been and now is the owner and holder thereof," and no part of said sum mentioned in said note has been paid.

As a second cause of action it is alleged that defendant on September 22, 1913, made and executed his certain promissory note for the sum of five thousand dollars payable one day after date to the order of the maker at the Savings Union Bank & Trust Company of San Francisco.

Similar averments follow as to indorsement and delivery to the Pacific Coast Salt Company, assignment by said company to plaintiff and nonpayment, as in the first cause of action. This note bore no date and as appeared, was executed June 16, 1913.

A general and special demurrer was overruled and defendant filed a second amended answer; admitted the execution on September 22, 1913, of the note set forth in the first cause of action, but denied that he delivered said note to said salt company; alleged that no consideration was ever paid to or received by defendant for said promissory note, and that the same was signed by defendant without any consideration therefor; denied on information and belief the alleged assignment of said note by the salt company to plaintiff and denied that plaintiff is the owner and holder thereof; denied that defendant owes plaintiff or any other person anything on account of said note set forth in the first cause of action and alleged in that behalf the said note was made without any consideration.

Answering the second cause of action, admitted the execution of the five thousand dollar note, but denied its indorsement or assignment to the salt company and denied that the note was made on September 22, 1913, and denied its assignment by the salt company to plaintiff and that plaintiff is the owner and holder thereof; denied any indebtedness thereon and alleged that said note was made without any consideration.

For a further and separate answer and defense to each of said notes, alleged, that said notes mentioned in said first and second causes of action, were made pursuant to the following agreement between W. C. Wilcox, president and manager of said Pacific Coast Salt Company and defendant:

"This agreement, made and entered into this 16th day of June, 1913, between W. C. Wilcox, the party of the first part, and Jasper Harrell, the party of the second part, W. C. Wilcox being of the City and County of San Francisco, and Jasper Harrell being of the City of Visalia, Tulare County, State of California,

"Witnesseth: That the party of the first part agrees to give his proxy for all of the common stock now held by him, in the Pacific Coast Salt Company.

"It is understood and agreed, that the salaries of the Secretary and Treasurer is to be $100.00 per month, payable in United States Gold Coin, and the railroad fares to and from San Francisco for the purpose of attending director's meetings; the party of the second part agrees to purchase five thousand dollars worth of seven per cent income debenture bonds subject to the subscription of Fifty thousand dollars ($50,000.00) of these bonds to be called by the Savings Union Bank and Trust Company, to be held there in trust for the Pacific Coast Salt Company and to be dispersed according to the directors of the Pacific Coast Salt Company for the purchase of salt property and the erection of a refinery.

"Witness our hands and seals this 16th day of June, Nineteen Hundred and Thirteen.

"W. C. WILCOX.
"A. J. HARRELL."

"The party of the first part further agrees to accept as collateral to secure payment of the Debenture Bonds, any of the Standard Bonds now held by the party of the second part, no expense to be incurred by the party of the second part. At the maturity of the Debenture Bonds, the party of the first part will return the Bonds put up as collateral by the party of the second part.

"W. C. WILCOX.
"A. J. HARRELL."

That said Wilcox was at all times mentioned in the answer president of said salt company and said agreement was executed on its behalf by said Wilcox; that on or about September 19, 1913, the following agreement was signed by defendant:

### "SUBSCRIPTION AGREEMENT:

"The undersigned hereby severally subscribe, each for himself, in the amounts set opposite our respective names, for the

seven per cent Cumulative Income Debenture Bonds of the Pacific Coast Salt Company, secured by a Trust Indenture of the properties now owned or that may hereafter be acquired by said Company during the life of said Debenture.

"It is understood that the principal shall become payable in twenty (20) years after date and interest payable semi-annually on the first of January and July, and if earned, otherwise to the extent that the net earning of the Company will permit, the remainder of such interest to accumulate and become payable with the principal of said Debentures.

| | |
|---|---|
| "W. C. WILCOX | $2000. |
| "F. C. CARDWELL | $1000. |
| "A. J. HARRELL | $5000. |
| "OTTO SPENKER | $1000. |
| "JOHN BOYCE | $1000.00 |
| "F. C. HANSCHELDT | $1000.00 |
| "MATTH. WEISSER | $5000." |

That said promissory note of five thousand dollars was signed by defendant pursuant to said last above agreement and was to cover the amount of the subscription of said defendant under said agreement aforesaid, and not otherwise, "and was intended for a subscription for five Cumulative Income Debenture Bonds of the Pacific Coast Salt Company for $1000 each, secured by a trust indenture as in said agreement stated and in that behalf said defendant alleges that the bonds so subscribed for by defendant were never, nor were any thereof ever, delivered to or received by defendant, or ever offered to defendant, and defendant alleges on information and belief that no bonds, of any kind or description of said Pacific Coast Salt Company, were ever made or issued under or pursuant to the terms of said agreement aforesaid, or otherwise, or at all"; that on or about September 19, 1913, "an agreement herein referred to as 'Exhibit B,' was signed by said A. J. Harrell and by said Pacific Coast Salt Company, a copy of which said agreement is as follows:

"This agreement, made and entered into by and between A. J. Harrell, of Visalia, State of California, and the Pacific Coast Salt Company, organized under the laws of the State of California and having its principal place of business in the City and County of San Francisco,

"Witnesseth: That, whereas, the said Pacific Coast Salt Company is desirous of issuing, and is about to issue, one

hundred (100) bonds of One thousand dollars ($1000.00) each, and to sell and dispose of fifty (50) of said bonds for $1000.00 each, for the purpose of raising money to erect a plant and purchase salt lands, and to erect a plant thereon for the purpose of refining salt;

"And whereas, there have been subscribed of the said fifty bonds of one thousand dollars each, sixteen (16) bonds for which the Company has the notes of subscribers in the aggregate sum of sixteen thousand dollars ($16,000.00) ; and

"Whereas, the said A. J. Harrell is willing to underwrite the balance of said fifty thousand dollars ($50,000.00) issue, to wit: Thirty four bonds of one thousand dollars each.

"Now, therefore, it is agreed between the parties hereto as follows:

"That the said Company upon the issuance of said bonds will deliver to the said A. J. Harrell thirty four (34) thereof in consideration of a promissory note by said A. J. Harrell in the sum of thirty four thousand dollars ($34,000.00) ; that said promissory note together with the said notes covering the sixteen thousand dollars ($16,000) already subscribed, shall be deposited with the Savings Union Bank & Trust Company of San Francisco, for the purpose of the trust herein to be created by said Company.

"That the said A. J. Harrell agrees to sell said bonds for the Company, receiving in consideration of said sale the accrued interest due thereon at the time of said sale.

"That the Company promises and agrees to pay all preliminary expenses of the issuance of said bonds, and all the preliminary and other expenses, including commissions of agents incurred in the sale thereof, and to assist in every possible way to make a market for the said bonds.

"That as fast as said bonds are sold, the said moneys obtained from the sale thereof shall be deposited by said Harrell in some bank or banks, designated by him, until the full number of bonds which he hereby assumed to sell shall have been sold, and thereupon said moneys shall be delivered to the Savings Union Bank & Trust Company of San Francisco, to be applied by said bank in accordance with the trust agreement hereafter to be made by said Pacific Coast Salt Company for the issuance of said bonds.

"It is further agreed that no moneys realized from the sale of said bonds after the same has been deposited with the

banks designated by said Harrell, shall be withdrawn there-from, except upon the joint order of the said A. J. Harrell and the directors of the Pacific Coast Salt Company.

"In witness whereof, the parties hereto have executed this contract the 19th day of September, 1913.

"A. J. HARRELL,

"PACIFIC COAST SALT CO.,

"By W. C. WILCOX,

"President & General Mgr.

"(Seal)  A. E. MATTESON,

"Asst. Secty."

That said promissory note of thirty-four thousand dollars was signed by defendant "pursuant to said agreement referred to herein as 'Exhibit B' and hereinbefore set forth," and said note "was intended to be delivered only as in said agreement, 'Exhibit B,' stated and not otherwise, and only upon delivery to said A. J. Harrell of thirty four bonds of $1000.00 each of said Pacific Coast Salt Company as provided in said agreement, and in that behalf said defendant alleges that said thirty four bonds were never, nor were any thereof ever, delivered to or received by defendant, or ever offered to defendant, and defendant alleges on information and belief that no such bonds and no bonds of any kind or description of said Pacific Coast Salt Company, were ever made or issued by said Pacific Coast Salt Company, and said defendant further alleges that there was no consideration for said agreement referred to as 'Exhibit B.' "

Defendant prays that each of said notes be declared void and be canceled and that plaintiff take nothing by his action.

The cause was tried by jury and defendant had the verdict, whereupon judgment was entered that plaintiff take nothing by this action and that defendant recover his costs. Plaintiff appealed from the judgment under the alternative method.

The Pacific Coast Salt Company (hereinafter called the salt company) was incorporated for the purpose of carrying on the business of manufacturing salt, etc., and had its principal place of business at San Francisco. It took over the assets and business of the Dento Salt Company, formerly doing business in the city of Stockton. The present controversy arose out of defendant's connection with the Pacific Coast Salt Company. The president and manager of the

salt company, W. C. Wilcox, met defendant in Stockton on or about June 15, 1913. Defendant had read or there was read to him a letter written by Mr. Welch, president of the Savings Union Bank & Trust Company of San Francisco, of date April 14, 1913, in which Welch stated what he understood were the plans of the salt company for "financing certain projects." These plans were stated to be: 1. To raise fifty thousand dollars to be placed with the bank and to be disbursed "for the acquisition of real estate and the erection thereon of buildings for the purpose of a salt refinery"; 2. "To raise the money through the issue of what is known as 'Income Debentures,' of which this company (the bank) will be the trustee," and to be secured by the salt company's property. The letter then explains what is meant by "Income Debentures," and the form they should take and like matters, inclosing "a form of subscription blank." The form of "subscription agreement" subsequently prepared and used is attached to defendant's answer and, at the time of the meeting between Mr. Wilcox and defendant, had been signed by W. C. Wilcox, two thousand dollars and F. C. Cardwell, one thousand dollars. Wilcox and defendant went to San Francisco and on June 16, 1913, entered into the agreement set out in the answer, by which Wilcox agreed to give defendant his proxy for all the common stock then held by him and by which defendant agreed to purchase five thousand dollars worth of the bonds subject to the subscription of $50,000 of these bonds to be called by the Savings Union Bank & Trust Company. At the same time and as part of the same transaction, as the evidence was, defendant signed the "subscription agreement" for five thousand dollars of the bonds and executed the five thousand dollar note sued upon. (The complaint alleged the date of this note as September 22, 1913.) Additional subscriptions for bonds were subsequently obtained by Wilcox aggregating the sum of sixteen thousand dollars as shown by the agreement.

In the early part of September, 1913, Wilcox went to Visalia, defendant's home, to consider further with him the matter of completing the subscription agreement.

Defendant, as the result of this conference, took from his safe deposit box in a Visalia bank, stocks and bonds amounting to forty thousand dollars and sent them by express to the San Francisco trust company above referred to and de-

fendant and Wilcox went to San Francisco. Upon going to the trust company, defendant and Wilcox were told that the trust company would not accept anything but money in carrying out the proposed plan of financing the company. Defendant withdrew his securities from the trust company, and they do not appear further in the case. Wilcox and defendant then went to the office of Attorney Fairall, who drew up for them what is called the "underwriting agreement" of September 19, 1913, set forth in the answer. At the same time, Wilcox and defendant entered into the following agreement, referred to for convenience as the "control agreement":

"This agreement, made and entered into by and between A. J. Harrell, of Visalia, Tulare County, State of California, and W. C. Wilcox of the City and County of San Francisco, State of California,

"Witnesseth:

"Whereas, the said W. C. Wilcox owns a majority of the shares of the capital stock of the Pacific Coast Salt Company; and

"Whereas, the said A. J. Harrell has entered into an agreement with the Pacific Coast Salt Company this day for underwriting thirty four (34) bonds of One thousand Dollars ($1,000.00) each, to be issued by the said Pacific Coast Salt Company.

"Now, therefore, it is agreed that the said W. C. Wilcox shall vote the stock of said Pacific Coast Salt Company for the purpose of electing Directors thereof as shall be directed by the said A. J. Harrell and there shall be elected, besides the said W. C. Wilcox, four other directors selected and chosen by the said A. J. Harrell and said A. J. Harrell shall have control of said stock owned by the said W. C. Wilcox in the said Pacific Coast Salt Company for and during the full period of time that the said bonds of the said Pacific Coast Salt Company shall be an outstanding obligation against the said A. J. Harrell.

"In Witness Whereof, the parties hereto have executed this contract this 19th day of September, 1913.

"A. J. HARRELL,   (Seal).
"W. C. WILCOX,   (Seal)."

The note for thirty-four thousand dollars dated September 22, 1913, the evidence tended to show, was signed at the same

time as the "underwriting agreement," and the "control agreement." About the same time there was issued to defendant thirty-four hundred shares of the salt company's stock of the par value of $10 each.

On September 23, 1913, a meeting of the salt company directors was held, at which a resolution was passed ratifying the "underwriting agreement." Certain directors resigned and directors acceptable to defendant were chosen in their stead, namely; defendant and Charles Gibson of Visalia. Geo. A. Macdougald was elected to fill a vacancy. These three were chosen at defendant's suggestion and on October 14, 1913, defendant's wife was made a director. Defendant was elected secretary and treasurer at the September meeting and was voted a salary of one hundred dollars per month to commence immediately. Director Gibson was not present and as the action of a full board was required to authorize the bond issue, no action was then taken. On the following day, September 24, 1913, attorney Fairall prepared a letter of instruction to the trust company at the request of Wilcox and defendant, in which were inclosed the subscription notes of the various subscriptions for the first sixteen thousand dollars, including defendant's note for five thousand dollars and also the other note for thirty-four thousand dollars. It was stated in the letter that these notes were placed with the trust company "at the present time for safekeeping and the company will hereafter, as soon as the bond issue has been authorized, give you more particular instructions. . . . Proceedings are now being taken by the Pacific Coast Salt Company to authorize a bond issue of $160,000.00, $50,000.00 of which will be taken by the makers of the several notes which are inclosed herewith, in the amounts specified in said notes respectively." The trust company was requested to acknowledge receipt of this letter "by letter addressed to the Pacific Coast Salt Company." On September 26, 1913, a letter was sent by the salt company to each of the subscribers of bonds. It stated that subscriptions to the amount of fifty thousand dollars had been taken and the notes of the subscribers placed in the hands of the trust company. Remittance was requested of the amount of the respective subscriptions, and it was stated that as soon as all the money is paid in—fifty thousand dollars—bonds will be issued to the subscribers and meanwhile the trustee "will issue temporary certificates for the amount

of money received from each subscriber," exchangeable for bonds when issued. Defendant had knowledge of the issuance of this letter. There seems not to have been any important business transacted by the salt company after this letter went out until October 14, 1913, when it became possible to have a full attendance of the board of directors. Meanwhile, however, defendant was in San Francisco and in and out of the company's office attending to such duties as were required of him as secretary and treasurer. On October 14, 1913, a resolution was introduced by defendant and passed by a unanimous vote authorizing a bond issue of one hundred and sixty thousand dollars, and setting forth its object and the character and form of the bond, etc. A letter, signed by defendant as secretary, was sent out to the stockholders of the salt company informing them of the passage of the above resolution; that the first issue of fifty thousand dollars has been subscribed and notes for the same placed with the trust company and "requesting the stockholders to sign the inclosed authorization and have the same acknowledged before a notary public and mailed to the company immediately," and inclosing a copy of the resolution. The amount of the bonded indebtedness was fixed at one hundred and sixty · thousand dollars—an increase from the original amount contemplated—after a full discussion of the probable needs of the company.

Defendant continued in the discharge of his duties as secretary and also visited Stockton for the purpose of selling bonds. On November 5, 1913, he drew one hundred and fifty dollars and left the office of the company going to Visalia as he testified—"to try to get subscriptions to the bonds," and did not again return to the company's office.

Up to this point, so far as the salt company was called upon to act, it had apparently done all it could toward the issue of the bonds. The directors had authorized the issue, and the stockholders had been notified and their ratification requested.

Under the law, however, no bonds could be issued until stockholders holding two-thirds of the subscribed or issued capital stock had filed with the secretary their written assent to the bond issue. (Civ. Code, sec. 359, subd. 5.)

No meetings of the directors were had in the months of November and December, 1913, or January and February,

1914. The minutes show Directors Wilcox and Collins present and the remaining directors absent, and, no quorum being present, the meeting adjourned. This action was brought on February 5, 1914, and at the regular meeting in March, 1914, the resignations of Directors Gibson, Macdougald, Mrs. Harrell and defendant were accepted and others elected in their places.

At the bringing of the action the consent of two-thirds of the stockholders to the bond issue had not been obtained, and no bonds had been issued, nor has such consent been since obtained nor have any bonds been issued since so far as the evidence shows.

Arriving at Visalia, defendant consulted his attorney and being advised that he "was getting the worst of it," he made no effort to sell bonds and made up his mind to go no further with the enterprise. On cross-examination he testified:

"Q. Did you ever intend to do anything after talking with your attorney in November, toward the selling of bonds or obtaining subscriptions? A. I did not.

"Q. So that your mind, after talking with your attorney in November, 1913, was made up that you would never carry out your agreement made on the nineteenth day of September, 1913? A. He told me that I was getting the worst of it.

"Q. Your mind was then made up that you would never go ahead with it? A. He told me that I was getting the worst of it, and, of course, I would not go ahead with it.

"Q. When you say 'of course, I would not go ahead with it,' you mean that your mind was made up then that you would never go ahead and complete the agreement? A. Why, certainly, yes, sir."

About November 25, 1913, defendant went to San Francisco and met Dr. Wilcox at the Olympic Club. Defendant testified on his cross-examination:

"I phoned Dr. Wilcox to meet me at the Olympic Club. I handed him my resignation as a director and also as secretary and treasurer.

"Q. When you handed it to Dr. Wilcox, did you give him any reason why you wanted to resign? A. I believe that I did.

"Q. What did you say? A. I have forgotten the exact reason now that I gave him, but something about—I have forgotten the exact reason; I cannot remember it now.

"Q. Did you give him the true reasons?   A. No, sir.

"Q. I wish that you would refresh your memory and tell the court and jury the reason that you gave Dr. Wilcox for wanting to resign as a director and as Secretary and Treasurer.   A. I have got no way to refresh my memory right now. I have forgotten.

"Mr. Jarman: Q. Did you testify in respect to the following questions found on page 77 of your deposition, as follows: 'Q. Did you give Mr. Wilcox a reason why you handed in your resignation at that time?   A. Yes, sir.   Q. What was the reason?   A. I did not give him the correct reason because I did not like to say anything to him about it.   Q. What was the reason that you told him?   A. Let's see.   I told him—well, I was in trouble with my wife, having trouble with my wife and one thing another, and I wanted to get out of the Salt Company?   Q. You told Mr. Wilcox that you were having trouble with your wife and that you wanted to get out of it so that she could not get hold of your property?   A. Yes, sir.'

"Q. Didn't you give those answers to those questions on the taking of your deposition in this courtroom on the 31st day of October?   A. May I see the deposition?

"Q. Certainly [hands deposition to witness].   A. Yes, sir; I believe that I testified to that.

"Q. That is correct, is it?   A. Yes, I guess that it is."

Of this meeting, Dr. Wilcox testified:

"Mr. Jarman: After the 5th or 6th of November, 1913, when did you next see the defendant?   A. The 25th of November in San Francisco, in the Olympic Club.

"Q. Who was present?   A. Mr. Harrell and myself.

"Q. What did Mr. Harrell say to you at that time?   A. He said that—oh, after having a little conversation and coming right down to the business end of it, he said that he was having some trouble with his wife and that he would have to resign from the Company and he gave me to understand—

"Q. State what was said.   A. He said that it would be temporary.   And I asked him in relation to the bond business that we were on with the Company and he says, 'Well, that will have to stand.'   He says, 'For the time being, as I am having trouble with my wife and I do not care to be mixed up with anything right now, as I must get the securities out of my hands.'   He says, 'I am going back to

Visalia and going to work on a ranch at $45.00 a month,' I think he said. I says, 'Well, what are you going to do about the bonds of the company? Are you going to get them out or anything?' He says, 'They will have to stand.' He says, 'I won't have anything to do with them now.'

"Q. Is that the sum and substance of the conversation at the Olympic Club? A. That is about all there was. And we got on the train and went to Stockton the same day, I think it was."

Witness Wilcox thus describes their visit and final meeting which was about December 2, 1913:

"Mr. Jarman: Did you see Mr. Harrell again after the 25th of November? A. Along the early part of December.

"Q. Answer my question yes or no. A. Yes, sir.

"Q. When was it? A. The 2d of December.

"Q. When did you see him? A. At Visalia.

"Q. And where in Visalia? A. At his ranch.

"Q. Was there anybody else present? A. Oh, there was other people on the ranch there, but he and I were talking together.

"Q. What was said at that time, if anything, in reference to the bond issue of the company? A. Well, I told him that we had some land, the Matteson property in Alameda County, that we wished to purchase and that we would have to raise ten thousand dollars. I showed him the certificates of the deposit that I had collected from the bond men, and I told him that we had to have some more money and for him to help us out and fulfill his contract. He says, 'I can raise the money over around Exeter or Lindsay.' He says, 'I will let you know in five days exactly what I will do. I will telephone to you.' And I described the properties to him over there and told him about it and told him the importance of doing something in regard to this bond issue, and he gave the same reasons then. He says: 'I can't do anything.' He says, 'I haven't got anything.' He says, 'Everything is out of my name.' He says, 'I am simply working on a salary.'

"Q. Was that all that Mr. Harrell said about giving the ten thousand dollars? A. He told me that he was going to get it and let me have it in five days.

"Q. Did you ever hear from him after December 2d? A. No, sir, not from Mr. Harrell.

"Q. Did he ever send you ten thousand dollars or any part of the money? A. No, sir."

Wilcox testified that he wrote a letter to Harrell shortly after December 2, 1913, but received no reply. This letter was not introduced, nor its contents shown. He also testified that about March 20, 1913, he learned, but how does not appear, that defendant would not carry out his agreement. It may be remarked that neither in the pleadings nor in the evidence is there any suggestion of fraud, misrepresentation, or concealment on the part of the salt company or respondent. Appellant's contention is that the salt company did not fail in any respect to comply with its agreement; that the contract was breached by respondent; that respondent failed to establish that said notes were signed without consideration; that the delivery of bonds was not a condition precedent to liability because (a) not contemplated or intended by the parties; (b) even if necessary, performance was prevented by defendant; (c) any duty to render performance was discharged by defendant's repudiation of liability.

Defendant's contention is: First, "that the Salt Company had not carried out its agreement and that the consideration of the notes had failed by reason of the failure of the Salt Company to issue or tender any bonds." Second, that the "respondent had done nothing to hinder or prevent the Salt Company from carrying out its agreement which was to issue and tender the bonds."

Recurring to the September transaction, defendant testified that he never received any consideration for the thirty-four thousand dollar note. On his cross-examination for the purpose of showing otherwise, he was interrogated as to the thirty-four hundred shares of the salt company's stock that was issued to him. He was asked what he paid for it and answered: "I never paid anything for it; it was not my stock.

"Mr. Jarman: It was not what? A. It was not my stock.

"Q. It was not your stock? A. No, sir.

"Q. Where is that stock now? A. To the best of my belief, it is in the Pacific Coast Salt Company's safe. . . .

"Q. Did you ever have that stock certificate in your possession? A. Yes, sir.

"Q. Well, now, what did you do with it? A. To the best of my knowledge, I put it in the safe of the Company's office. . . .

"Q. When was the last time that you saw that stock in the safe of the Pacific Coast Salt Company? A. The day I put it there.

"Q. That is the last time that you ever saw it? A. Yes, sir.

"Q. You have had it since? A. No, sir, not to my knowledge. . . .

"Q. Did you transfer that stock at that time to anybody? A. No, sir.

"Q. Did you indorse it and deliver the certificate to anybody at that time? A. No, sir.

"Q. Did you ever return that stock to Mr. Wilcox or to the Pacific Coast Salt Company? A. I left it in their safe all the time."

On redirect examination, he testified: "Q. What was said in relation to the issuing of this 3,400 shares of stock of the Pacific Salt Company to you? A. Why, Mr. Wilcox and I held a little conversation about that and he said that when these bonds were sold, so much stock was to be given to each person that bought a bond, as a bonus, and that this block of stock was to be distributed to the different buyers of bonds, as a bonus." Objection being made to his answering whether this stock was given him as consideration for the note, he was permitted to state "anything else that was said." He testified: "Well, he [Wilcox] simply stated that it was understood and talked over that this stock was to be offered to anybody that would buy a bond, as a bonus to go with the bonds and because they never used the stock of the company, and was to be issued to the—this was a bonus that was to be given to everybody, was to be taken from this 3,400 shares of stock that I had, it just covered the bonds, just enough stock as a bonus for the bonds." Mr. Wilcox testified: "I told him that the stock was his and he could have it for the consideration of entering into this underwriting agreement, and that this was his profit in it. Nothing was paid to or received by the Pacific Coast Salt Company for the issuance of this stock." Upon this issue of fact the testimony was sharply in conflict. The jury had the right to accept defendant's statement as true and we see no reason why under the settled rule, we should not also accept it.

There was evidence that the instruments of assent to the bond issue of holders of 11,537½ shares were executed, but it

was not shown, nor was it claimed that this was two-thirds of the subscribed or capital stock of the salt company. And as already stated, no bonds were ever issued or tendered to defendant so far as appears in the record.

It seems to us that when these various agreements and the evidence otherwise introduced are fairly considered, the jury were justified in concluding therefrom that tender or delivery of the bonds called for by defendant's agreements, if not a condition precedent, was a condition concurrent to his liability on these notes and unless, as contended by plaintiff, performance was prevented by defendant, there was a failure of consideration and his liability was at an end. Concededly the bonds were never issued and, of course, could not be and were not tendered or delivered.

Section 1439 of the Civil Code provides: "Before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself; and must be able and offer to fulfill all conditions concurrent so imposed upon him or the like fulfillment by the other party, except as provided by the next section." This latter section (1440) provides: "If a party to an obligation gives notice to another, before the latter is in default, that he will not perform the same upon his part, and does not retract such notice before the time at which performance upon his part is due, such other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party."

The bond issue depended for its legality upon the consent of two-thirds of the stockholders, and while it is admitted that such consent was not obtained, appellant urges, first, that defendant prevented the securing of this consent; and second, that plaintiff was discharged from any duty to tender bonds by defendant's repudiation of his liability.

The five thousand dollar note was given as part of the transaction under which the first agreement of June 16, 1913, and the "subscription agreement" were executed. At that time no bonds had been authorized by the salt company and the subscription by subscribers was "subject to the subscription of fifty thousand dollars of these bonds to be called by the Savings Union & Trust Company." The addendum to the Wilcox-Harrell agreement had reference to this proposed

issue and this "call" by the Savings Union Bank.   We have seen that defendant withdrew the securities contemplated by the addendum, and that feature of the transaction was ended.

This note bore the following indorsement: "This note is subject to a subscription of $50,000.00, 7% debenture bonds, when same will be due and payable.   Subject to agreement entered into this 16th day of June, 1913."   It bore no date, and while it was made payable on its face one day after date, it was in fact payable only subject to the agreement referred to and was given and was payable upon the condition that fifty thousand dollars of the company's bonds were subscribed. Only sixteen thousand dollars were subscribed, and under the indorsement on this note it never became payable and there was a failure of consideration.

In September defendant entered into certain other agreements which referred to this five thousand dollar note although it remained subject to the agreement of June 16, 1913. The first of these agreements of September 19, 1913, the so-called "underwriting agreement," was between defendant and the salt company.   By this agreement, the proposed bond issue was increased to one hundred thousand dollars, or one hundred bonds of one thousand dollars each, of which it was proposed to sell 50 bonds of one thousand dollars each, and it was therein recited that "there had been subscribed 16 bonds" for which the company has the notes of subscribers in the aggregate, the sum of sixteen thousand dollars, including defendant's note for five thousand dollars.   It was also recited that defendant was willing "to underwrite the balance of said $50,000.00 issue, to wit, 34 bonds of $1,000.00 each" and it was agreed that upon the issuance of said bonds the salt company "will deliver to the said A. J. Harrell thirty-four (34) thereof in consideration of a promissory note by said A. J. Harrell in the sum of thirty-four thousand dollars ($34,000.00) ; that said promissory note, together with the said notes covering the sixteen thousand dollars ($16,000) already subscribed, shall be deposited with the Savings Union & Trust Company for the purpose of the trust herein to be created by said Company."   Then follows a provision that defendant "agrees to sell said bonds for the Company, receiving in consideration of said sale the accrued interest due thereon at the time of said sale."   The company was to pay all expenses of the issuance of the bonds, commissions, etc.,

and to assist in marketing the bonds. The moneys obtained from the sale were to be deposited by defendant in some bank and upon the sale of the full number of bonds "which he hereby assumed to sell," was to be delivered to the savings bank and applied "in accordance with the trust agreement hereafter to be made" by said salt company, "for the issuance of said bonds."

The second agreement between defendant and Wilcox, called the "control agreement," recited that "the said W. C. Wilcox owns a majority of the shares of the capital stock of the Pacific Coast Salt Company," and referred to the fact that defendant had entered into the last above agreement, and stated that "it is agreed that the said W. C. Wilcox shall vote the stock of said Pacific Coast Salt Company for the purpose of electing directors thereof as directed by the said A. J. Harrell, and there shall be elected besides the said W. C. Wilcox, four other directors selected and chosen by the said A. J. Harrell and the said A. J. Harrell shall have control of the said Pacific Coast Salt Company for and during the full period of time that said bonds of said Pacific Coast Salt Company shall be outstanding obligations against the said A. J. Harrell."

Defendant executed his note for thirty-four thousand dollars, which, with the other notes, was deposited with the savings bank. The "underwriting agreement" makes no mention of defendant's getting any stock. He was to sell certain bonds when issued and to receive accrued interest as his compensation. His thirty-four thousand dollar note, like his five thousand dollar note, was executed in consideration of his receiving certain bonds when issued. He was not to receive any of the money derived from the sale of bonds except this accrued interest, for it was to be deposited with the savings bank in accordance with a trust to be created by the salt company.

Clearly, defendant was not to pay the note unless the bonds were delivered to him, and he certainly was not to pay the note and also pay over the proceeds of the bonds when sold. Had he received the bonds and sold them and deposited the proceeds as provided for he would no longer have been liable on his note. But in no case was he liable unless the bonds were delivered to him or the salt company was able to deliver them.

It seems quite clear to us that this "underwriting agreement" was a contract to sell bonds rather than one to buy bonds and the most that can be made of it is that it was what is commonly understood by the term "underwriting," namely, that in the event defendant failed to sell the bonds referred to he, the underwriter, will take such bonds as he does not sell. But defendant's liability for nonperformance was dependent upon the salt company's producing and tendering the bonds. (*Kirkpatrick* v. *Eastern Milling & Export Co.,* 135 Fed. 147; same case 137 Fed. 387, [69 C. C. A. 579].) Defendant's note served no other purpose, and was intended to serve no other purpose than to stand as security for the bonds that were to be placed with him for sale, and quite probably as an assurance that he would faithfully pay over the money received by him for the bonds, no part of which had he a right to retain as his own. It would seem to follow, that defendant never having received any bonds to sell, he is not in default and all consideration for his note has failed.

The so-called "control agreement" imposed on Wilcox the obligation to vote for directors satisfactory to defendant, and defendant was to have control of Wilcox's stock during the period of time that the bonds of the salt company might be outstanding as an obligation against defendant. We have given the evidence as to the three thousand four hundred shares of stock issued to defendant from which it appeared that it was in reality not his, but was to be given to purchasers of bonds as a bonus, and that he left this stock in the company's safe and has not since seen it and never made any use of it. It formed no part of the consideration of the thirty-four thousand dollar note. It was not until October 14, 1913, that the bond issue was authorized by the directors which was then fixed at one hundred and sixty thousand dollars.

Defendant, as we have seen, signed, as secretary, a notification to stockholders of the passage of this resolution and calling for their consent. He remained at the company's office until November 5, 1913, performing his duties as secretary and made an unsuccessful trip to Stockton to obtain subscriptions for bonds. We can discover no consideration for defendant's notes, aside from such consideration as is implied by their execution, except the promise to deliver to defendant the bonds of the salt company, and as no bonds were ever issued and no authority for their issue shown, there was a

failure of consideration. This was the situation in November, when defendant returned to his home in Visalia, and it was the situation when the action was commenced in February, 1914, and still is so far as shown.

The question remains: Was defendant responsible for this situation, and if not, still had he so acted toward the salt company as to relieve it from performance on its part?

The bond issue failed because the consent of two-thirds of the shareholders of the salt company was not obtained thereto. Responsibility for this nonconsent of stockholders was not brought home to defendant. He had no agreement to secure this consent. It does not appear that the agreement of June 16, 1913, by which Wilcox was to give defendant his proxy for Wilcox's common stock was carried out. The so-called "control agreement" of September 19, 1913, was carried out so far as the election of directors was concerned, but the control otherwise was to be during the period that the "bonds shall be an outstanding obligation against" defendant, and that period never arrived. He did not have possession of Wilcox's stock or such control over it as prevented Wilcox from consenting to the bond issue. There was no evidence that he did anything to prevent the shareholders from giving their consent, nor was there any evidence that he influenced or attempted to influence any director to refrain from attending meetings. He did not believe that he was the owner of thirty-four hundred shares, or had any right to deal with them as owner. Appended to the transcript are the affidavits of such stockholders as gave their consent, 11,537½ shares, and among these is the unverified written statement of Wilcox showing his consent and that he owned 5,211½ of these shares and voted them. If he owned other shares, it was not shown (except by recital in the "control agreement"), and it thus appears, notwithstanding the "control agreement," that Harrell did not, in fact, control Wilcox's shares to the point of having a right to vote them, nor did defendant do anything to prevent Wilcox, as a stockholder, from giving his consent to the bond issue.

The suggestion of appellant that defendant should have given his consent as the owner of three thousand four hundred shares is answered by his testimony that he did not own them. It was not shown that had he sent in his consent it would have made up the required two-thirds of all the shares. Wil-

cox testified that the salt company received nothing for this stock either in money, labor, or property, and it may be doubted whether its issue was valid (Civ. Code, sec. 359), inasmuch as the only consideration for which it was issued was as a bonus for bonds which were never authorized or issued.

Defendant testified that he made up his mind, after returning to Visalia and consulting his attorney, to have nothing more to do with the salt company, and that he would not go ahead with his agreement of September 19, 1913. Just what he meant by this admission is not clear. There were several agreements of that date—the "underwriting agreement," the "control agreement," his note for thirty-four thousand dollars. The examination of the witness did not bring out what he referred to by "the agreement of September 19, 1913." Whatever his state of mind was he did not communicate it to the salt company. What he did was to remain passive. He had taken part in the proceedings up to and including the authorization of the bond issue by the directors, and what remained to be done was to obtain the consent of two-thirds of the stockholders over which he had no control. The making up his mind to go no further with the salt company did not in any way prevent the stockholders from acting and had two-thirds of them consented, and had the bonds been issued, at that time or later defendant's mental attitude would not have relieved him from liability. We do not think his having resolved to have nothing more to do with the salt company amounted to such repudiation of his obligation as to release the company from performance on its part.

When he met Mr. Wilcox at the Olympic Club and handed his resignation as director and secretary to Wilcox, the reason he gave, whether the correct one or not, was not accompanied by any statement that he repudiated his obligation to the salt company. He said nothing and did nothing which would relieve the salt company from issuing the bonds. And when Wilcox saw defendant December 2, 1913, at Visalia, Wilcox's object in going there apparently was to raise ten thousand dollars for the purchase of land. Defendant was not asked to pay his bond subscription and nothing was said about his carrying out his agreements, nor was defendant informed that the company was ready or able to deliver the bonds and his note was not yet due. Before the salt company could avoid performance, defendant's refusal to perform should appear to

have been explicit, positive, and unequivocal. The rule stated by Mr. Benjamin is as follows: "A mere assertion that the party will be unable, or will refuse to perform his contract is not sufficient; it must be a distinct and unequivocal, absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made." (Benjamin on Sales, sec. 568.)

In 6 Ruling Case Law, page 1025, the rule is thus stated: "In order to justify the adverse party in treating the renunciation as a breach, the refusal to perform must be of the whole contract or of a covenant going to the whole consideration, and must be distinct, unequivocal, and absolute. . . . It may be observed, however, that the renunciation itself does not *ipso facto* constitute a breach. It is not a breach of the contract unless it is treated as such by the adverse party." (*Hanson* v. *Slaven,* 98 Cal. 377, 382, [33 Pac. 266]; *Bell* v. *Bank of California,* 153 Cal. 234, 242, [94 Pac. 889].)

In *Smoot's Case,* 15 Wall. 36, [21 L. Ed. 107], it was held that mere assertion that the party will be unable, or will refuse to perform his contract, is not sufficient to terminate it; it must be distinct and unequivocal absolute refusal to perform, treated and acted on as such by the promisee. Approved in *Dingley* v. *Oler,* 117 U. S. 503, [29 L. Ed. 984, 6 Sup. Ct. Rep. 850].

Cases cited by appellant where the defaulting party "has made it impossible for the contract to be performed" or where the defendant "by his own act prevented the performance by the complaining party," are not in point, for the reason that we do not think the facts bring the case within the rule governing in such cases.

Certain minutes of the salt company corporation were offered in evidence, and upon objection by defendant refused admission. These minutes pertained to the issuance of the bonds of the corporation. Later the resolution that was adopted October 14, 1913, authorizing the bonds, was introduced and furnished the evidence which was intended by the minutes. There was, therefore, no prejudice in the ruling.

In several pages of appellant's brief is printed the cross-examination of defendant relative to payment of the five thousand dollar note, and the understanding of the parties as to the meaning of the contract of June 16, 1913. Some of the questions were answered, while objections to others were sus-

tained. The agreement, aside from the addendum, seems to be clear and not open to parol explanation. As to the added paragraph, its purpose is not plain. Apparently, it was not intended that what are referred to as defendant's "standard bonds" were offered as security for defendant's note, but were to secure the payment of the company's debenture bonds contemplated. The evidence was that the savings bank would not accept them, and they were taken back by defendant and did not figure in any subsequent proceedings. We cannot see that appellant was prejudiced by the rulings of the court. Some questions on cross-examination of defendant as to what he did with the three thousand four hundred shares of the company's stock issued to him, were objected to and sustained. One was whether defendant had ever offered to return the shares to the company, and the other was whether he had ever written a letter to the company advising it that the stock was in its safe. Defendant had testified, as we have shown, what he did with the stock, and that it was intended to be used as a bonus to purchasers of bonds and was not his stock. Full latitude should have been given to test the probability or improbability of defendant's account of this stock. Several questions were asked and answered along this line. The questions objected to should have been allowed, but we do not think the ruling was prejudicial.

The court gave the following instruction: "You are instructed that when a corporation proceeds to issue bonds by resolution of its board of directors, the resolution authorizing the bond issue must first be adopted by a unanimous vote of the board of directors at a regular meeting, or at a special meeting called for such purpose. Any resolution so adopted for the issuance of bonds must be afterward approved by the written assent of stockholders of the corporation holding at least two-thirds of the subscribed or issued capital stock of the corporation, and such written assent must be filed with the secretary of the corporation.

"If you find from the evidence in this case that the resolution authorizing the issuance of debenture bonds and adopted by the board of directors of Pacific Coast Salt Company on October 14th, 1913, was not thereafter, and prior to the commencement of this action, approved by the written assent of stockholders of said company holding at least two-thirds of the capital stock of the corporation, and that such written

assents were not filed with the secretary of the Company prior
to the commencement of this action, then plaintiff cannot re-
cover in this action and your verdict must be for defendant.''

Appellant objects to the second subdivision of this instruc-
tion as being ''regardless of any act by defendant, whether
preventing performance or repudiating his contracts, etc., it
was necessary for the Salt Company to perform on its part,
even though informed by defendant that he would not per-
form on his part''; and that the instruction ''is in direct con-
flict with section 1440 of the Civil Code.'' It is urged that
the vice of this instruction becomes apparent when consid-
ered in connection with certain other instructions requested
by plaintiff and given by the court with a proviso. There
are five of these instructions. The first instruction was ad-
dressed to a case where there is evidence that one party to
a contract has by some act deliberately made it impossible for
the contract to be performed, such act in law amounts to a
prevention of performance, and if the evidence offered showed
that defendant entirely repudiated his agreements ''there has
been no failure of consideration,'' etc. The second instruc-
tion was that where one of the parties to a contract declares
that he will not perform his part, he thereby releases the other
party from the contract; if, therefore, defendant declared he
would not pay the notes sued on, there has been no failure of
consideration and plaintiff should recover. The third instruc-
tion was addressed to the proposition that if defendant pre-
vented by act or conduct or by renunciation of liability under
the contracts sued upon, during the period that the company
had a right to deliver or tender the bonds, it was not neces-
sary for the company to tender or deliver the bonds. The
fourth was that if a party declares himself not bound by the
contract he cannot set up failure in either demand or tender
on the part of the other party as a defense to an action
brought by such other party on the contract and that offer
to perform is waived or unnecessary ''when it is reasonably
certain that the offer will be refused or that performance will
not be accepted.'' The fifth instruction was that the slightest
consideration is sufficient to support the most onerous obliga-
tion, and that inadequacy of consideration is for the parties
to consider and not for the court or jury when the contract is
sought to be enforced; that ''we are not concerned with the
motive that induced Harrell to enter into the agreements in-

troduced in this case," if supported by a sufficient consideration as heretofore defined.

To each of these instructions the court added the following: "Unless you find from the evidence that the resolution adopted by the board of directors of said company authorizing the issuance of said debenture bonds, was not prior to the commencement of this action approved by the written assent of the stockholders of said company holding at least two-thirds of the subscribed or issued capital stock of the said company, and that such written assents were not filed with the secretary of said company prior to the commencement of this action, in which event your verdict must be for the defendant."

After giving the foregoing instructions as modified, the court gave the following instruction: "You are further instructed that the want of performance of an obligation, in whole or in part, or any delay therein, is excused when the debtor is induced not to make it by any act of the creditor intended, or naturally tending to have that effect, done at or before the time at which such performance or offer may be made, and not rescinded before that time."

Appellant does not object to this last instruction, but it contends that "not only are the foregoing instructions misleading and confusing, but the proviso added by the court makes them clearly erroneous and necessitates a reversal of the judgment."

To determine the importance of appellant's criticism, it becomes necessary to again call attention to the situation developed by the evidence. Beyond doubt, the burden was upon plaintiff to show affirmatively that defendant by his conduct prevented the company from getting out its bond issue. And the rule of law unquestionably is as stated by Mr. Benjamin in his work upon Sales: "In order to justify the adverse party in treating the renunciation as a breach, the refusal to perform must be of the whole contract or of a covenant going to the whole consideration, and must be distinct, unequivocal, and absolute." Further, "the renunciation itself does not *ipso facto* constitute a breach. It is not a breach of the contract unless it is treated as such by the adverse party." (Benjamin on Sales and cases cited, *supra.*) There was no evidence that defendant omitted a duty resting upon him by contract or as a director in the matter of issuing these bonds. All that the directors could do had been done and a circular

letter had been sent out to stockholders calling for their consent to the bond issue. Responses to this letter came in and were filed but concededly not by two-thirds of the shareholders. Defendant had not agreed to obtain these consents and there was no implied obligation upon him to do so. There was not a particle of evidence that he influenced or tried to influence any stockholder to withhold his consent, nor was there a particle of evidence that he influenced or attempted to influence any director to act in any particular way, and there is no evidence that any action or inaction of the directors had anything to do with the failure of two-thirds of the stockholders to give their consent. There is absolutely no explanation or reason shown why the requisite two-thirds did not consent. Had defendant sent in the consent of the three thousand four hundred shares assessed to him, it would not have made up the requisite number. It is, therefore, immaterial whether or not we accept defendant's testimony that these shares did not belong to him.

The so-called "contract agreement" did not purport to require a transfer of Wilcox's shares to defendant and they never were so transferred. Wilcox agreed to vote for directors satisfactory to defendant, and that was done. The further provision was that defendant should have control of Wilcox's shares during the period that the bonds might be an outstanding obligation against defendant, a period which did not arrive. As shown above, Wilcox must have retained his shares in his own control for he sent in his assent to the bond issue as a shareholder. There was nothing in any agreement entered into by defendant requiring him to direct or authorize Wilcox, as a shareholder, to consent to the bond issue; nor was there any agreement that defendant should vote Wilcox's shares. Defendant exercised no control over the affairs of the company, and the evidence was that Wilcox was the president and general manager and conducted the business of the company.

Conceding that the instruction as given did not leave the jury free to consider the effect of defendant's alleged conduct as having prevented the company from issuing the bonds, there was no substantial evidence upon which the jury could have found for appellant on this issue.

We have stated and restated what defendant's obligations were. Briefly and in substance he in June, 1913, subscribed

for bonds to the amount of five thousand dollars, and gave his note without date for that amount upon the express condition written on the back of it: "This note is subject to a subscription of $50,000.00 seven per cent debenture bonds, when same (the note) will become due and payable." No bonds had yet been authorized by the directors of the salt company. At this time defendant had no connection with the company, and he made no agreement to do more than to take these bonds when issued to the extent of five thousand dollars. In the following September he became a director and secretary of the salt company. The agreement he then made in connection with his thirty-four thousand dollar note was to undertake the sale of bonds when issued of equivalent value and pay the proceeds to the savings bank for the salt company. By this so-called "underwriting agreement," the most defendant engaged to do was to take these bonds himself if he did not sell them. But he entered into no obligation to insure the issuance of the bonds or to pay his note whether or not bonds were issued.

Without repeating what has already been so fully stated, it may safely be said that the only outstanding and unperformed obligations of defendant are the two promissory notes in suit, the consideration for which has wholly failed since no bonds have ever been legalized or issued. We are unable to discover any obligation resting upon defendant which he has not performed in respect of this bond issue.

We do not think the jury would have been sustained by the evidence had they found that defendant by his conduct prevented or excused the company from issuing the bonds. He made no such renunciation as the courts have held to be necessary to constitute such a breach of his contract as would release the salt company from performance on its part—a release which in the present case would mean that defendant should pay thirty-nine thousand dollars to the company and receive nothing in return, a release also which would relieve the company from issuing any bonds, thus obtaining a large sum of money for nothing.

The rule of law is that "to justify the adverse party in treating the renunciation as a breach, the refusal to perform must be of the whole contract or of a covenant going to the whole contract, and must be distinct, unequivocal, and absolute, and it must be treated as such by the adverse party."

There was no evidence from which the jury were authorized to infer that any such renunciation was declared by defendant. Part of the contract which it is now claimed defendant breached required that the consent of two-thirds of the stockholders to the bond issue should be procured, and to do this was no part of defendant's obligation. Defendant did not contract to sell or underwrite something which had no existence and which became impossible of existence through no act of his. The obligation of the company had become impossible of performance. Under such a state of circumstances, the company had no right to enforce payment of those notes. The evidence did not warrant a finding by the jury that defendant had relieved the company from performance on its part, and, therefore, plaintiff was not prejudiced by the instructions.

The first instruction noticed was a correct statement of the law and, in restating its substance in the provisos to the other instructions noticed, there was no prejudice for the reason that there was not evidence sufficient to have warranted the jury in finding that the defendant prevented the issue of bonds, or that he so far repudiated his obligations as to relieve the salt company from issuing any bonds or tendering or delivering any bonds to defendant.

Objection is urged to the following instruction: "While it is true that the execution of the notes imports a consideration, the presumption that a consideration passed for the execution of the instruments is merely *prima facie*. It is disputable and may be overcome by direct proof. But disputable inferences or presumptions while evidence, are evidence the weakest and the least satisfactory.

"They are allowed to stand, not against the facts that they represent, but in lieu of proof of them. The facts being proven contrary to the presumption, no conflict arises, the presumption is simply overcome and dispelled and if you find from the evidence that no consideration was ever given for said notes or either of them, or that the consideration for said notes, or either of them, has failed, then as to such note or notes for which defendant received no consideration, or for which the consideration has failed, your verdict should be in favor of defendant."

This instruction, in its substance, was taken from *Ruth* v. *Krone,* 10 Cal. App. 770, 773, [103 Pac. 960]. It was not

there said that disputable presumptions are evidence the weakest and the least satisfactory. As a proposition of universal application this is not true. It was pointed out in *Hitchcock* v. *Rooney,* 171 Cal. 285, 289, [152 Pac. 913], that disputable presumptions "have such force as may in some cases outweigh positive evidence against them and sometimes such presumptions as we are here considering require clear and convincing evidence to overcome them." (Citing cases.)

. The disputable presumption here was that arising from the promissory notes admittedly signed by defendant. Facts were submitted by defendant tending to show want of consideration and failure of consideration and the instruction placed upon the jury the duty of determining the issue. The statement of the court which we think incorrect as a general proposition could not have been prejudicial for the fact was admitted out of which the presumption arose—namely, that defendant did, in fact, execute the notes.

We discover no prejudicial error in the instruction given as to where the burden rested of showing want of consideration for the notes. Nor do we think the court erred in instructing the jury that the fact that defendant was paid a salary of one hundred dollars for his services as secretary of the company constituted no consideration for the notes. There was no evidence, so far as we can discover, tending to show that this salary in any way induced defendant to make these notes.

The many angles to this case must be our apology for the unusual length of the opinion. We may be mistaken in our treatment of some of the phases of the case, but as to the verdict, we are convinced that it finds support in the evidence. And as to the rulings of the court and its instructions, whatever of error there may be, we cannot say "after an examination of the entire cause, including the evidence, that the error complained of has resulted in a miscarriage of justice." (Const., art. VI, sec. 4½.)

The judgment is affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 11, 1917.