[S. F. No. 19961. In Bank. Oct. 17, 1958.]

LEWIS GUERRIERI et al., Appellants, v. PHIL J. SEVERINI et al., Respondents.

Wild, Christensen, Barnard & Wild, William R. Manson and Robert M. Barnard for Appellants.

James Robert Nielsen, Iener W. Nielsen and Harold V. Thompson for Respondents.

CARTER, J.—Plaintiffs, Lewis Guerrieri, and his copartners in the Santa Fe Vintage Company, brought an action for damages for the breach of a contract for the sale of approximately 200,000 gallons of wine against defendant, Phil J. Severini. In that action the trial court found that there was no contract entered into between the parties. On appeal the judgment was reversed and a new trial was ordered. (*Guerrieri* v. *Severini,* 132 Cal.App.2d 269 [281 P.2d 879].)

At the second trial, the court found that there was a valid written contract between the parties which had been breached by defendant Severini but that plaintiffs had suffered no damage thereby.

Plaintiffs here contend that certain findings of the trial court are unsupported by the evidence. These findings will be discussed separately hereafter.

Plaintiffs who are copartners are the owners of the Santa Fe Vintage Company which engages in the business of producing, buying, bottling and marketing wine. Their principal place of business is in Los Angeles. Defendant and his wife were the owners of the Severini Winery and Distillery. Fritz Kyer was an independent wine broker doing business in Fresno and in the case at bar acted as agent for both plaintiffs and defendant. On approximately March 27, 1953, Kyer went

to defendant and told him that he had an offer from the Santa Fe Vintage Company to buy defendant's wine and suggested a price of 36 cents per gallon therefor. Defendant accepted this offer and Kyer communicated the acceptance by telephone to Guerrieri at his place of business in Los Angeles. At Guerrieri's insistence Kyer prepared a written document which Severini read and signed on either March 30th or 31st.[1]

This document provided that approximately 200,000 gallons of sweet wines were "Sold to Santa Fe Vintage Co." and listed the quantities of each type of sweet wine involved. The price was stated to be 36 cents per gallon and it was provided that "All of the above wine to be out by August 1, 1953." This was "Accepted: Severini Winery & Distillery by Phil J. Severini (signed)." The contract was dated March 27, 1953, and its terms provided for "Cash for Entire Amount Immediately."

On the original appeal of this case the court noted that the provision for cash payment "immediately" meant "cash for entire amount within 48 hours"[2] (132 Cal.App.2d 269, 273).

Right after Severini had signed the contract on March 30th or 31st Kyer talked to Guerrieri in Los Angeles on the telephone and at Guerrieri's suggestion immediately mailed the signed contract to him there. In the conversation Kyer told Guerrieri that Severini wanted him to send someone to gauge the wine in the tanks at the winery but Guerrieri said he did not think it was necessary and that he would take Severini's figures as to the quantity. Approximately one hour after Severini had signed the contract and it had been mailed to Guerrieri in Los Angeles, Severini called Kyer on the telephone and told him that due to some domestic difficulties he was having with his wife a restraining order had been placed against his disposition of the wine and that he would be unable to deliver it. Kyer testified that he told Severini that the signed order had already been mailed to plaintiff in Los Angeles. At the second trial Severini admitted that at the first trial, when informed that the written signed order had already been sent to Guerrieri, he had said "Well, if that's

---

[1] Severini testified that he signed the order on March 27th. Defendant's brief (pp. 10 and 13) appears to concede that this is erroneous and the opinion on the first appeal specifically states that the contract was signed on the 30th or 31st of March.

[2] In this connection it should be noted that the reporter's transcript on the second trial is far from satisfactory and the record shows the difficulty the parties and witnesses had in recalling the events which occurred in 1953.

16

the case, that's all that can be done. We'll have to go through with it."[3]

When Kyer called Guerrieri on the telephone on March 30th or 31st to tell him that Severini had told him he would be unable to deliver the wine Guerrieri told him "you just have to get this wine because I want it. I tested and checked it and it is just the thing that we need."

The trial court, after finding (III) that the parties had entered into a binding, valid and enforceable contract "evidenced by a memorandum in writing, signed by the defendant" on March 27, 1953, found (V):

"That it was a term and condition of said contract that the plaintiffs were to have the wine tanks guaged at the Severini Winery and Distillery premises to determine the exact gallonage bought under the aforesaid contract within forty-eight hours of its execution, and that payment for the entire gallonage so bought was to be made by the plaintiff in cash for the entire amount immediately."

The record is uncontradicted that the gauging of the wine was no part of the contract; that which party was to do the gauging was never agreed on by the parties at any time.[4] In Finding VII the trial court found that the plaintiffs had not performed any of the terms, conditions and things on their part to be "done and performed under the said agreement, and specifically the plaintiffs did not guage the said tanks of wine in accordance with the aforesaid contract, nor did they tender payment to the *plaintiff* [defendant] in accordance with its terms." It is uncontradicted that plaintiffs were at all times ready, able and willing to pay for the wine.

In Finding VI, it appears "That on *March 27, 1956* [1953], subsequent to the execution of the aforesaid contract, and within twenty-four hours thereafter, the defendant, Phil J. Severini, *unconditionally repudiated* the contract and notified the plaintiffs that he would not deliver the wine in accordance with the said contract. That the refusal of the defendant to deliver the wine constituted a breach of the aforesaid contract." (Emphasis added.)

The record is uncontradicted that while the contract was dated March 27, 1953, it was actually signed on either March 30th or 31st, 1953, and that approximately one hour after

[3]This same statement also appears in the first opinion on appeal (132 Cal.App.2d 269, 273).

[4]This also appears in the first opinion on appeal (132 Cal.App.2d 269, 272).

signing the contract Severini notified Kyer that he would not be able to deliver the wine. However, as has been heretofore set forth the record shows that when informed by Kyer that the written order had been mailed to Guerrieri in Los Angeles Severini said, "Well, if that's the case, that's all that can be done. We'll have to go through with it." The record also shows that when Guerrieri was informed of Severini's repudiation he did not accept it but insisted that he wanted that particular wine and that Kyer would "have to get" it for him. The record also shows that at times subsequent to March 30th or 31st, 1953, Guerrieri, Kyer and Severini tried to negotiate for the delivery of at least half of the wine which was the subject matter of the contract. A letter from Kyer to Guerrieri, dated April 29, 1953, which was introduced and marked as an exhibit, stated that "Phil [Severini] tells me that the wine he offered to give you is his exact half and represents all the wine he has in the winery with the exception of lees." Following a description of the wines and the quantities thereof, is a statement that the total gallonage is 88,000 gallons; that it was ready to ship, that Severini "would like for you to draw at least three truck loads a week until it is all out"; and the manner in which payment should be made. There is also a statement in the letter that "I did overlook mentioning that he [Severini] also told me that in case he got a release from his wife on the second half that you would be given first opportunity to buy it." The letter contains no mention of the price per gallon.

There is also in the record as an exhibit, a letter to Kyer from L. Kenneth Say as "Attorney for Severini Winery & Distillery" dated April 24, 1953, in which he refers to his client's "offer" of March 27th to sell 200,000 gallons of wine to the Santa Fe Vintage Company of Los Angeles and stating that since this "offer" has never been accepted by plaintiff's company "said offer is hereby withdrawn."

The record shows that with respect to the negotiations concerning the 88,000 gallons of wine which Severini represented to be one-half of the wine on hand at his winery, Guerrieri demanded to see Severini's Government Form 702 as evidence that the 88,000 gallons constituted one-half of the wine in the winery. This is, apparently, a government inventory of the wine in a winery. Severini refused to show him the Form 702.

On April 29, 1953, plaintiffs purchased the Morello Winery in order to get the quantity and quality of wine they desired.

Prior to that time Kyer had been able to purchase for plaintiffs only about 74,000 gallons of such wine.

The doctrine of breach of a contract by anticipatory repudiation is recognized in this state (*Caminetti* v. *Pacific Mut. Life Ins. Co.*, 23 Cal.2d 94, 104 [142 P.2d 741]). "An anticipatory breach of contract occurs on the part of one of the parties to the instrument when he positively repudiates the contract by acts or statements indicating that he will not or cannot substantially perform essential terms thereof. . . ." (*Crane* v. *East Side Canal etc. Co.*, 6 Cal.App.2d 361, 367 [44 P.2d 455].) "Anticipatory breach must appear only with the clearest terms of repudiation of the obligation of the contract. (*Atkinson* v. *District Bond Co.*, 5 Cal.App.2d 738 [43 P.2d 867]; *Gold Min. & Water Co.* v. *Swinerton*, 23 Cal. 2d 19 [142 P.2d 22]; 4 Cal.Jur.Supp. 197.)" (*Hertz Driv-Ur-Self Stations, Inc.* v. *Schenley Distilleries Corp.*, 119 Cal.App. 2d 754, 760 [260 P.2d 93].)

Even if we assume that Severini's statement to Kyer that he would not deliver the wine, which it will be recalled was followed by the statement that "we'll have to go through with it," amounted to that positive repudiation in the "clearest terms" required by the law, it is not within the power of one party to a contract to discharge it by repudiating it. (*Main St. etc. Co.* v. *Los Angeles Traction Co.*, 129 Cal. 301, 306 [61 P. 937]; *Atkinson* v. *District Bond Co.*, 5 Cal.App.2d 738 [43 P.2d 867]; *Tomboy Gold & Copper Co.* v. *Marks*, 185 Cal. 336 [197 P. 94]; *Rehart* v. *Klossner*, 48 Cal.App.2d 46, 51 [119 P.2d 148]; *Wilton* v. *Clarke*, 27 Cal.App.2d 1, 4 [80 P.2d 141].)

If we assume that Severini's statement amounted to a positive repudiation of the contract entered into by him to sell to plaintiffs 200,000 gallons of wine, it had the effect of giving the buyer, or promisee, Guerrieri, the right of election either to treat the declaration as an empty threat and to wait until the time for performance arrived, or to act upon the declaration and treat it as a final assertion by Severini that he was no longer bound by the contract, and as a wrongful renunciation of the contractual relation into which he had entered. "If he elects to pursue the latter course, it becomes a breach of contract, excusing performance on his part and giving him an immediate right to recover upon it as such. Upon such election the rights of the parties are to be regarded as then culminating, and the contractual relation ceases to exist, except for the purpose of maintaining an action for

the recovery of damages. (6 Cal.Jur. 458-460; *Walker* v. *Harbor Business Blocks Co.*, 181 Cal. 773 [186 P. 356].)'' (*Atkinson* v. *District Bond Co.*, 5 Cal.App.2d 738, 743, 744 [43 P.2d 867].) ▮ In *Salot* v. *Wershow*, 157 Cal.App.2d 352, 357-358 [320 P.2d 926], the rule was stated to be that ''among other requirements for application of the doctrine of breach by anticipatory repudiation are that the repudiatee treat the repudiation as a breach, and that there have [sic] been no retraction of the repudiation by the repudiator prior to the time for performance *or prior to a detrimental change in position on the part of the repudiatee in reliance thereon.* (See *Rauer's Law & Collection Co.* v. *Harrell*, 32 Cal.App. 45 [162 P. 125].)'' (Emphasis added.) (And see *Abraham Lehr, Inc.* v. *Cortez*, 57 Cal.App.2d 973, 978 [135 P.2d 684]; *Big Boy D. Corp., Ltd.* v. *Etheridge*, 44 Cal.App.2d 114, 117 [111 P.2d 953].)

▮ When the uncontradicted facts shown by the record are considered in the light of the applicable law as heretofore set forth, it appears that while Severini's statement on the 30th or 31st of March that he would not deliver the wine, *may* be considered as an anticipatory repudiation of the contract,[5] it was not accepted, or acted upon, as such by Guerrieri, the promisee, at that time. In other words, Guerrieri did not then elect to treat the repudiation as a breach of the contract. But when Guerrieri materially changed his position on April 29, 1953, by purchasing the Morello Winery in order to obtain the quantity and quality of wines needed by the Santa Fe Vintage Company, he exercised his election to treat the repudiation as a breach of the contract of sale.

The fact that Guerrieri did not make payment in full within 48 hours as provided in the contract is, under the facts here presented, immaterial. (*Guerrieri* v. *Severini*, 132 Cal.App.2d 269, 273 [281 P.2d 879]; *Atkinson* v. *District Bond Co.*, 5 Cal. App.2d 738, 745 [43 P.2d 867]; *Fisher* v. *Chaffee*, 49 Cal. App.2d 97, 100 [121 P.2d 51].) ▮ As stated in section 320 of the Restatement of Contracts: ''Manifestation by the injured party of a purpose to allow or to require performance by the promisor in spite of repudiation by him, does not

---

[5]It would appear that Severini's statement on March 30th or 31st was not ''distinct, unequivocal and absolute'' within the rule set forth in *Atkinson* v. *District Bond Co.*, 5 Cal.App.2d 738, 748 [43 P.2d 867], and *Salot* v. *Wershow*, 157 Cal.App.2d 352, 357-358 [320 P.2d 926]. The letter written by Severini's attorney on April 24, 1953, appears to constitute the repudiation.

nullify its effect as a breach, or prevent it from excusing performance of conditions and from discharging the duty to render a return performance.

"*Comment*:

"a. Although the effect of repudiation may be nullified . . . it operates until so nullified not only as a breach but as a continuing excuse of conditions . . . and as a continuing justification of the promisee's failure to perform a return promise . . . even though the promisee has indicated a willingness to forgive the repudiation." (See also Civ. Code, § 1440.)

It appears, therefore, that Finding VI, as heretofore set forth, is not supported by the evidence.

Finding VIII is "That at the time of the defendant's refusal to deliver and *within twenty-four hours of the defendant's breach* of the said contract, there was available for purchase on the open market at Fresno, California, assorted sweet wines in sufficient quantities *and of a like quality as that contracted for* at an identical price per gallon.

"That the plaintiffs knew of the availability, *but that they unjustifiably refused to purchase the same.* That if plaintiffs had purchased the wine so offered to them, they would have suffered no damage whatsoever by reason of the defendant's refusal to deliver the wine under the aforesaid contract." (Emphasis added.)

The record shows that prior to Guerrieri's purchase of the Severini wine he had examined samples of not only the wine referred to in Finding VIII, but other wines as well; that he had his winemaker examine them for alcohol sugars and quality. Guerrieri testified that "The result of that examination [of the Severini wines] was that they were very good wines. Some of them, especially the Muscat and Angelica, higher in balling sugar, which made them more valuable wines than the alcohol outside of the Angelica, which was 18.8 per cent"; that samples of other wines had been sent to him and rejected by him. The record shows that on March 30th or 31st when the contract was signed by Severini there was available a lot of 225,000 gallons of *unfinished* wine which was one of the wines which had been previously rejected by Guerrieri; that this wine was sold to a third person later in the day on March 30th or 31st after Guerrieri had been told of Severini's statement that he would not deliver the wine contracted for. The evidence is uncontradicted that this so-called available wine was unfinished wine, whereas the Severini wine was

finished; that it was not as high in either alcohol or sugar content as the Severini wine, and that the Severini wine included muscat wine while this lot included muscatel.[6] Kyer testified that the 225,000 gallon lot of unfinished wine was available on the afternoon of the repudiation by Severini, but that it was sold later the same afternoon. There is no evidence in the record to show that wines similar in alcohol and sugar content were available in the quantity desired by plaintiffs. If we were to hold, as contended for by defendant, and as found by the trial court, that plaintiffs were required, on the day Severini repudiated the contract, to buy immediately, within the hour, wines of lesser quality than that contracted for, and which had been previously rejected by them, we would be depriving the promisee of his election to treat the repudiation as a breach or continue to stand on the contract and would be forcing him to accept the repudiation as a breach of contract in violation of the rules of law heretofore set forth.

Kyer testified that on or about April 17, 1953, he purchased some 74,000 gallons of wine for Guerrieri at 40 cents per gallon; that the wine in the Morello Winery purchased by Guerrieri on April 29, 1953, was priced at 42½ cents per gallon. It appears from the record that on approximately April 7th or 8th, 1953, the San Joaquin Valley experienced an unseasonable frost which resulted in the greatly increased prices of the same type wines. There is evidence in the record that after the frost muscat wine comparable to that which Severini had agreed to sell to plaintiffs and as high in sugar content was selling for 55¢ per gallon.

Section 1787, subdivisions 1, 2 and 3, of the Civil Code provide: "(1) Where the property in the goods has not passed to the buyer, and the seller wrongfully neglects or refuses to deliver the goods, the buyer may maintain an action against the seller for damages for nondelivery.

"(2) The measure of damages is the loss directly and naturally resulting in the ordinary course of events, from the seller's breach of contract.

"(3) Where there is an available market for the goods in question, *the measure of damages,* in the absence of special circumstances showing proximate damages of a greater amount, *is the difference between the contract price and the market or current price of the goods at the time or times when*

---

[6]Muscat wine is made of 100 per cent muscat grapes while muscatel is a blend of muscat and other grapes.

*they ought to have been delivered, or, if no time was fixed, then at the time of the refusal to deliver."* (Emphasis added.)

It is defendant's position that the buyer, Guerrieri could have taken delivery of all of the wine at any time after the contract was signed; that no time, or times, were specified for delivery even though the contract provided that all of the wine must be taken from the winery by August 1, 1953. It is defendant's theory that there was no anticipatory repudiation in the case at bar; that an actual breach took place on March 30th or 31st, 1953, and that the damages should be measured as of that time. From what we have heretofore said, it is obvious that defendant's argument is without merit inasmuch as he could not, by repudiating the contract, force the buyer into accepting the repudiation as a breach of contract. ■ It appears to us that the actual breach took place on April 29, 1953, when the buyer elected to treat the repudiation as a breach by materially .changing his position in buying the Morello Winery in order to obtain the quantity and quality of wine necessary to fulfill his needs and to replace that which defendant had agreed to sell.[7] Plaintiffs argue in their opening brief (p. 13) that they were forced to pay a 9 cents increase per gallon over the contract price in their purchase of replacement wine. The record shows that the wine at the Morello Winery was 42½ cents per gallon unfinished; that finishing would cost from 1¾ cents to 2½ cents per gallon. In this connection it should be noted that plaintiffs' complaint alleges that they have been damaged in the sum of $78,000. This appears to be a typographical error inasmuch as they correctly compute the sum (according to their figures in their opening brief) as $18,000.

Defendant contends that plaintiffs had a duty to mitigate damages by accepting the lot of wine which was available for a short time after defendant's repudiation on March 30th or 31st. Reliance is placed on the case of *Las Palmas etc. Distillery* v. *Garrett & Co.*, 167 Cal. 397, 400 [139 P. 1077], wherein it was held that defendant had not been damaged since it could have purchased large quantities of wine of the "same kind, quality, and quantity as it claimed was to be furnished and sold by plaintiff, at prices not in excess of the

---

[7]It should be noted here that while plaintiffs' complaint alleges that defendant notified plaintiffs that they would not deliver the wines on *May 13, 1953*, there is no evidence in the record to substantiate this date as the date of the repudiation. The dates of the various conversations and correspondence have been heretofore set forth and are uncontradicted.

prices mentioned in the contract. . . ." In the Las Palmas case there had been an oral agreement for the purchase and sale of wine. This agreement specifically called for its confirmation in writing which was never done. The court emphatically pointed out that there was more than sufficient evidence in the record to support the trial court's determinations. In the case under consideration there is no evidence in the record to show that the "same kind, quality, and quantity" of wine was available for plaintiffs to purchase.

With respect to plaintiffs' duty to mitigate damages, the rule is that "The duty to minimize damages is predicated upon the statutory rule that a person is required to use reasonable care to prevent an unwarranted piling up of damages. The extent of the duty is to use ordinary care and diligence to prevent the enhancement of damages, and the duty does not extend to the necessity of going to extraordinary or unusual lengths to minimize damages. (*Jegen* v. *Berger*, 77 Cal. App.2d 1 [174 P.2d 489]; *Baker* v. *Borello*, 136 Cal. 160 [68 P. 591]; *Ash* v. *Soo Sing Lung*, 177 Cal. 356 [170 P. 843].)" (*Scott's V. F. Exch.* v. *Growers Refrigeration Co.*, 81 Cal.App.2d 437, 451 [184 P.2d 183].) And "The duty to minimize damages does not require an injured person to do what is unreasonable or impracticable. . . ." (*Valencia* v. *Shell Oil Co.*, 23 Cal.2d 840, 846 [147 P.2d 558].) (And see: *Crag Lumber Co.* v. *Crofoot*, 144 Cal.App.2d 755, 780 [301 P.2d 952]; *Johnson* v. *Comptoir etc. D'Exportation*, 135 Cal.App.2d 683, 689 [288 P.2d 151]; *Questo* v. *Dorado*, 136 Cal.App.2d 332, 336 [288 P.2d 529]; *Gagne* v. *Bertran*, 43 Cal.2d 481, 491 [275 P.2d 15].) It would be unreasonable and impracticable under the facts here presented to require plaintiffs, within an hour of the breach by anticipatory repudiation by Severini, to buy unfinished wine inferior in quality which had previously been rejected by them, in order to mitigate the damages caused by defendant's breach.

It is our conclusion that the judgment should be reversed with directions to the trial court to retry the cause on the sole issue of the amount of damages suffered by plaintiffs in replacing the wine covered by the contract breached by defendant Severini.

The judgment is reversed with directions to retry the case on the sole issue of damages.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.