Filed 9/25/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MISSION BEVERAGE COMPANY, | B271781 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC578821) |
| v. | |
| PABST BREWING COMPANY, LLC, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Maureen Duffy-Lewis, Judge. Affirmed.

McDermott Will & Emery, Richard K. Welsh, Gregory R. Jones, and Jeffrey A. Zuidema for Defendant and Appellant.

Morgan Lewis & Bockius, Thomas M. Peterson, Brian C. Rocca, Phillip J. Wiese, and Seth M. Gerber for Plaintiff and Respondent.

\* \* \* \* \* \*

A brewer of beer decided to replace one of its distributors, and sent that distributor a letter terminating their distribution contract and invoking the statutory procedure requiring an existing distributor to negotiate and, if necessary, arbitrate with its successor to settle the "fair market value" of its distributorship rights (Bus. & Prof. Code, § 25000.2).[1]  The ousted distributor sued the brewer for breaching the contract's termination-for-cause requirement and for declaratory relief. The brewer responded with a motion to strike the entire complaint under the anti-SLAPP[2] statute (Code Civ. Proc., § 425.16).  This appeal presents two questions:  (1) Does a brewer's cancellation of a contract, when that cancellation will be followed by negotiation and possibly arbitration under section 25000.2, qualify as "protected activity" within the meaning of the anti-SLAPP statute?; and (2) Does the ousted distributor's lawsuit for breach of contract and declaratory relief lack minimal merit on the ground that section 25000.2 immunizes successor brewers from liability for breach of contract because it affirmatively grants those brewers a right to terminate distribution contracts and provides full compensation for the ousted distributor?  We conclude that the answer to both questions is "no," and accordingly affirm the trial court's denial of the brewer's anti-SLAPP motion in this case.

---

[1]     All further statutory citations are to the Business and Professions Code unless otherwise indicated.

[2]     "SLAPP" is short for "strategic lawsuit against public participation."

2

## FACTS AN PROCEDURAL BACKGROUND

### I.    Facts

Defendant and appellant Pabst Brewing Company, LLC (Pabst) is a brewer of beers; among others, Pabst brews such American classics as Pabst Blue Ribbon, Colt 45 Malt Liquor, Old Milwaukee, Schlitz, and Stroh's.

In January 2009, Pabst entered into a written Distributor Agreement (Agreement) with plaintiff and respondent Mission Beverage Company (Mission).  Pabst granted Mission the exclusive right to distribute many of its beers within specifically delineated boundaries within Los Angeles County.  In turn, Mission promised to "aggressively promote, encourage, and increase" the sales of, and "customer satisfaction" with, those beers.  The parties' powers to terminate the contract were not the same:  Mission could terminate the contract with 60 days' notice and irrespective of cause, while Pabst could terminate the contract only for one of ten enumerated reasons and then only if it gave Mission an opportunity to cure.  One of those ten reasons, memorialized in section 8.2.10 of the Agreement, permits Pabst to terminate the Agreement if Pabst has a "right to terminate" under "applicable state or federal law, statute or regulation."  The Agreement also provides that any and all litigation should occur in court, and contemplates that Mission recover attorney's fees if it prevails in litigation against Pabst.

In November 2014, Pabst came under new ownership.  Three months later, in February 2015, Pabst sent Mission a letter "commencing termination" of the Agreement "pursuant to . . . [section] 25000.2 and Section 8.2.10 of [the] . . . Agreement."  Pabst stated that Classic Distributing & Beverage Group, Inc. (Classic) and Beauchamp Distributing

3

Company (Beauchamp) would be replacing Mission as Pabst's distributor.[3]  Pabst did not cite any other basis for terminating the Agreement.

As discussed more fully below, section 25000.2 provides that when a brewer who acquires the right to manufacture beer "cancels any of [an] existing beer wholesaler's rights to distribute [a] product," that successor brewer's designated replacement distributors must negotiate in good faith—and, failing that, arbitrate—with the existing distributor "to determine the fair market value of the affected distribution rights."  (§ 25000.2, subds. (b), (d), (e) & (f).)  Adhering to these procedures, Pabst's designated distributors tried to negotiate with Mission and, when that failed, in March 2015, sent Mission a letter initiating arbitration.

## II.    Procedural Background

In April 2015, Mission sued Pabst for (1) breach of contract, and (2) declaratory relief.  Specifically, Mission alleged that Pabst breached the Agreement by "attempting to terminate" the Agreement on the basis of section 25000.2, which did not "provide an independent right to terminate . . . ."  Mission also sought a declaration that there was no valid "termination" of the Agreement.

Mission made several attempts to halt the ongoing arbitration between itself and Pabst's newly designated distributors, all to no avail.  Mission made an ex parte motion to stay the arbitration, but that motion was denied "without prejudice" to filing a noticed motion.  Mission thereafter filed a

---

[3]    Pabst named a third distributor, Harbor Distributing, LLC, in its letter, but that distributor at some point dropped out of the running to replace Mission.

4

noticed motion, but that motion was also denied. Not deterred, Mission also asked the arbitrator to dismiss the arbitration, but the arbitrator refused.

The arbitrator issued a final award in October 2015. In the award, the arbitrator made clear that his order "contain[ed] no findings, declarations or damages determinations regarding Mission's [pending civil] cause of action . . . that Pabst breached the . . . Agreement." However, the arbitrator fixed the fair market value of the distributorship rights conferred by the Agreement.[4] Mission did not appeal the award, and Classic and Beauchamp thereafter paid Mission the amount fixed by the arbitrator.

Pabst then filed a motion to strike Mission's lawsuit under the anti-SLAPP statute.[5] Pabst argued that the "linchpin" of Mission's lawsuit was Pabst's "invo[cation of] the statutorily-mandated arbitration process under [s]ection 25000.2," which Pabst asserted was "protected activity" under the anti-SLAPP statute. Pabst further contended that Mission's lawsuit lacked minimal merit because no "legally viable or non-duplicative remedy" remained once Mission had accepted the payment reflecting the fair market value of its distributorship rights from Classic and Beauchamp.

---

[4] Pabst has moved to augment the record with an unredacted version of the arbitrator's award revealing proprietary financial data and the actual amount awarded. Because the proprietary data and the award amount are not relevant to our resolution of the issues in this appeal, we deny the motion to augment.

[5] Pabst also filed a demurrer, which was subsequently overruled and is not challenged on appeal.

The trial court denied the motion. The court acknowledged that "protected activity" under the anti-SLAPP statute included activities related to "official proceeding[s]" such as "statutorily required . . . arbitration[s]," but concluded that Mission's lawsuit was separate and distinct from the arbitration: The lawsuit was "for breach of the contract between [Mission and Pabst]," while the arbitration was "between the distributors," and the primary issue in the lawsuit—"whether the [Agreement] was validly terminated"—is "an issue separate [from] (and prerequisite to) the arbitration, . . . not part of [it]."

After the trial court entered its order, Pabst filed this timely appeal.

## DISCUSSION

Pabst argues that the trial court erred in denying its anti-SLAPP motion. We independently review the trial court's ruling. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).) Because this case lies at the intersection of the anti-SLAPP statute and the Alcoholic Beverage Control Act (§ 23000 et seq.), we will discuss the pertinent portions of each before turning to the merits of this appeal.

### I. The Anti-SLAPP Statute

The anti-SLAPP statute "provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) Specifically, the anti-SLAPP statute protects—and thus "subject[s] to a special motion to strike"—any "cause of action . . . arising from any act of [a] person in furtherance of the person's right to petition or free speech under the United States

6

Constitution or the California Constitution in connection with a public issue."  (Code Civ. Proc., § 425.16, subd. (b)(1).)

When a party moves to strike a cause of action (or portion thereof) under the anti-SLAPP statute, a trial court has two tasks.  (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321 (*Barry*).)

First, the court must evaluate whether the moving party has "made a threshold showing that the challenged cause of action arises from protected activity."  (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.)  This evaluation turns on two subsidiary questions:  (1) What conduct does the challenged cause of action "arise[] from"; and (2) is that conduct "protected activity" under the anti-SLAPP statute?

A cause of action "arises from" protected activity when the "cause of action *itself*" is "*based on*" protected activity.  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*City of Cotati*); *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1114 (*Briggs*) ["arises from" means "based upon"].)  Whether a cause of action is itself based on protected activity turns on whether its ""*principal thrust or gravamen*"" is protected activity—that is, whether the "'core injury-producing conduct'" warranting relief under that cause of action is protected activity.  (*Colyear v. Rolling Hills Community Assn. of Rancho Palos Verdes* (2017) 9 Cal.App.5th 119, 134.)

"[W]hether [activity] is protected under the anti-SLAPP statute" turns "not [on] First Amendment law, but [rather on] the statutory definitions in [Code of Civil Procedure] section 425.16, subdivision (e)."  (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 422 (*City of Montebello*).)  Code of Civil Procedure section 425.16, subdivision (e) defines four categories of protected

7

activity.  Two are pertinent here—namely, (1) "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law," and (2) "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law."  (Code Civ. Proc., § 425.16, subd. (e)(1) & (2).)

Second, and only if the court concludes that the litigant has made this "threshold showing," the court must examine whether the nonmoving party has "established . . . a probability that [it] will prevail" on the challenged cause(s) of action.  (Code Civ. Proc., § 425.16, subd. (b)(1); *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819-820 (*Oasis West*).)  This burden is met if the nonmoving party demonstrates that any challenged cause of action has "minimal merit" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 94), and it does so by making a "prima facie factual showing sufficient to sustain a favorable judgment" on that cause of action (*Baral*, *supra*, 1 Cal.5th at pp. 384-385).  In assessing the sufficiency of this showing, a court is to "consider the pleadings, and supporting and opposing affidavits" (Code Civ. Proc., § 425.16, subd. (b)(2)), but must ""'accept as true the evidence favorable to the [nonmoving party] and evaluate the [moving party's] evidence only to determine if it has defeated that submitted by the [nonmoving party] as a matter of law.'"" (*Oasis West*, at p. 820.)  If the nonmoving party satisfies its burden, the anti-SLAPP motion must denied; if it fails to do so, the pertinent cause of action must be dismissed.  (*Barry*, *supra*, 2 Cal.5th at p. 321.)

## II. The Alcoholic Beverage Control Act

The Alcoholic Beverage Control Act (Act) is designed, among other things, "to eliminate the evils of unlicensed and unlawful manufacture, selling, and disposing of alcoholic beverages." (§ 23001.) To accomplish this end, the Act divides up the distribution chain for alcohol into three tiers—namely, (1) "manufacturers," (2) "wholesalers" or distributors, and (3) "retailers" (§§ 23012, 23021, & 23023); requires each to be licensed (§§ 23300, 23356, 23378, 23393, 23394, 23396, & 23402); and generally prohibits each from having an ownership interest in the others (§§ 23772, 23776, & 23784).

"The sale of beer is . . . highly regulated." (*Crown Imports, LLC v. Superior Court* (2014) 223 Cal.App.4th 1395, 1406-1407 (*Crown Imports*).) That is because, in addition to the Act's general provisions, several provisions specifically regulate the contractual relationships between "beer manufacturers" (or brewers) and "beer wholesalers" (or distributors). (§ 25000 et seq.) The Act requires their agreements to be in writing and to specifically "designate [the] territorial limits" of any grant of distribution rights. (§ 25000.5, subds. (a) & (b).) The Act prohibits a brewer from retaining the power to terminate a distribution agreement "solely" due to the "beer [distributor's] failure to meet a sales goal or quota" unless that goal or quota is "commercially reasonable under the prevailing market conditions." (§ 25000.7, subd. (a).) And the Act permits a brewer to contractually reserve the right to prohibit a distributor from changing its ownership, but renders the brewer "liable in damages to the" distributor if the brewer "unreasonably withholds consent or unreasonably denies approval of a sale, transfer, or assignment of any ownership interest." (§ 25000.9.)

9

Section 25000.2 dictates the procedures to be followed when a "successor beer manufacturer . . . acquires the rights to manufacture" held by a brewer, and then "cancels any of the [brewer's] existing beer [distributor's] rights to distribute the product." (§ 25000.2, subd. (b).) The successor brewer "cancels" a distribution contract if it "terminate[s], reduce[s], [does] not renew, [does] not appoint or reappoint, or cause[s] any of the same." (§ 25000.2, subd. (a)(4).) The pertinent procedure is as follows. First, the successor brewer must "notify" the existing distributor of its "intent to cancel any of the existing [distributor's] rights to distribute the product." (§ 25000.2, subd. (c)(1).) Second, the entity the new brewer wants to be its new distributor—whom the Act calls the "successor beer manufacturer's designee"—is required to "negotiate in good faith" with the existing distributor to "determine the fair market value of the affected distribution rights." (§ 25000.2, subd. (d); see also § 25000.2, subd. (a)(9) [defining "[s]uccessor beer manufacturer's designee"].) "Fair market value" is defined as "all elements of value, including, but not limited to, goodwill." (§ 25000.2, subd. (a)(6).) If the existing distributor and the successor brewer's preferred distributor can "agree to the fair market value," then the successor brewer's preferred distributor "shall compensate the existing" distributor "in the agreed amount." (§ 25000.2, subd. (d).) If they "are unable to mutually agree," then the successor brewer's preferred distributor "shall initiate arbitration . . . to determine the issue of compensation for the fair market value of the affected distribution rights" following the timelines set forth in the statute, and if the existing distributor does not appeal the arbitration award, the successor brewer's preferred distributor must pay the existing distributor that

10

amount. (§ 25000.2, subd. (f).) The existing distributor continues to distribute the beer until and unless the above-described procedures have run their course and the existing distributor receives the amount fixed by negotiation or arbitration. (§ 25000.2, subds. (e) & (g).)

## III. Analysis

### A. *Do Mission's Claims Arise From Protected Activity?*

Pabst argues that the trial court erred in concluding that Mission's breach of contract and declaratory relief claims did not arise from protected activity because (1) those claims are based upon Pabst's letter purporting to cancel the Agreement, and (2) that letter invokes section 25000.2's procedures and is accordingly preparatory to statutorily mandated arbitration, which constitutes an official proceeding within the meaning of Code of Civil Procedure section 425.16, subdivision (e)(1) and (2). The two parts of Pabst's argument dovetail exactly with the two subsidiary questions underlying the first step of anti-SLAPP statute analysis: What conduct is the basis for the challenged claim(s), and does that conduct constitute protected activity? We turn to each question.

#### 1. *What conduct by Pabst is Mission challenging?*

A claim is subject to the anti-SLAPP statute only if conduct constituting protected activity "*itself* is the wrong complained of." (*Park, supra*, 2 Cal.5th at p. 1060, italics in original; *City of Cotati, supra*, 29 Cal.4th at p. 78.) Thus, where a plaintiff's claim is based upon "an action or decision" of the defendant, it is not enough that some protected activity by the defendant *precedes* that action or decision, that some protected activity *is the means of communicating* that action or decision, or that some protected activity *constitutes evidence of* that action or decision. To fall

11

under the anti-SLAPP statute, the challenged action or decision itself must *be* protected activity.  (*Park*, at pp. 1060-1061.)

Accordingly, where a plaintiff's claim attacks only the defendant's decision to undertake a particular act, and if that decision is not itself protected activity, that claim falls outside the ambit of the anti-SLAPP statute.  Thus, in *Park*, our Supreme Court held that the anti-SLAPP statute did not apply to a claim challenging a university's decision to deny tenure to a professor, even though the decision was communicated in writing and even though the university dean's comments supplied evidence of discriminatory animus.  (*Park*, *supra*, 2 Cal.5th at pp. 1068-1069.)  In *Ulkarim v. Westfield LLC* (2014) 227 Cal.App.4th 1266, 1275-1276, 1279, the court held that the anti-SLAPP statute did not apply to a claim challenging a landlord's decision to terminate a tenancy, even though the landlord subsequently served a notice to quit and filed an unlawful detainer lawsuit.  And in *McConnell v. Innovative Artists Talent & Literary Agency, Inc.* (2009) 175 Cal.App.4th 169, 176-177, the court held that the anti-SLAPP statute did not apply to a claim challenging an employer's decision to wrongfully terminate employees, even though the employer later sent a letter terminating those employees.  Only when the decision that the plaintiff attacks is *itself* protected activity will the anti-SLAPP statute apply.  (See *City of Montebello*, *supra*, 1 Cal.5th at p. 423 [decision to cast a particular vote as part of a city council meeting constitutes "protected activity"].)

In this case, Mission's breach of contract and declaratory relief claims challenge Pabst's decision to terminate the Agreement.  That is because both claims challenge Pabst's right to terminate the Agreement and, in particular, Pabst's assertion

12

that section 25000.2 provides such a right. Pabst's subsequent letter merely communicated Pabst's decision to terminate, but "that communication does not convert [Mission's] suit into one arising from such speech." (*Park*, *supra*, 2 Cal.5th at p. 1068.)

Pabst raises two challenges to this reasoning. First, Pabst argues that *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192 (*Kibler*) supports its position that *every* aspect of a statutorily mandated proceeding, including the decision itself, is protected activity. *Kibler* held that a hospital's decision to revoke a doctor's staff privileges as part of a statutorily mandated peer review process constituted protected activity under the anti-SLAPP statute. (*Id.* at pp. 199-200.) A handful of cases read *Kibler* to stand for the proposition that every aspect of a statutorily mandated procedure constitutes protected activity. (See *DeCambre v. Rady Children's Hospital-San Diego* (2015) 235 Cal.App.4th 1, 22; *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65, 78-79, 82-84.) However, our Supreme Court's recent decision in *Park* expressly disapproves of that reading. *Kibler*, noted *Park*, "did not address whether every aspect of a hospital peer review proceeding involves protected activity" and thus "does not stand for the proposition that disciplinary *decisions* reached in a peer review process, as opposed to statements in connection with that process, are protected." (*Park*, *supra*, 2 Cal.5th at pp. 1069-1070, italics added.) In short, *Kibler* does not disturb the otherwise clear distinction between claims based on a defendant's *decision* and claims based on the means by which that decision is communicated.

Second, Pabst contends that Mission's claims are necessarily based on Pabst's letter because Mission's claims

13

*cannot* be based on Pabst's decision to terminate the Agreement. Mission's claims cannot be based on the decision to terminate, Pabst continues, because Pabst's decision did not take effect—and any claims attacking the decision itself were not ripe—until such time as Mission lost its distribution rights, which did not occur under section 25000.2 until Classic and Beauchamp paid Mission the amount of those rights as fixed in the arbitration. This contention ignores that a breach need not be effected to be actionable. A plaintiff may sue for anticipatory breach when the other party "'positively repudiates the contract by acts or statements indicating that [it] will not or cannot substantially perform essential terms thereof . . . .'" (*Guerrieri v. Severini* (1958) 51 Cal.2d 12, 18 (*Guerrieri*).) In such an instance, the party "''can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract.''" (*Ferguson v. City of Cathedral City* (2011) 197 Cal.App.4th 1161, 1168 (*Ferguson*); see generally Civ. Code, § 1440.) In this case, Mission's claims attack Pabst's decision to repudiate the Agreement; as noted above, the fact that the repudiation was communicated through a letter does not alter the basis of those claims.

### 2. *Is that conduct protected activity?*

The anti-SLAPP statute expressly delineates the four categories of activity that constitute "act[s] . . . in furtherance of [a] person's right of petition or free speech under the United States Constitution or the California Constitution." (Code Civ. Proc., § 425.16, subds. (b)(1) & (e).) As noted above, two of those categories are relevant to this case—namely, (1) "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by

14

law," and (2) "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law."  (Code Civ. Proc., § 425.16, subd. (e)(1) & (2).)

As a general rule, "private contractual arbitration" is "not . . . an 'official proceeding authorized by law'" under Code of Civil Procedure section 425.16, subdivision (e)(1) and (2), even though arbitration awards are subject to judicial confirmation or vacation.  (*Century 21 Chamberlain & Associates v. Haberman* (2009) 173 Cal.App.4th 1, 7-9.)  That is because "[a]rbitration is not a judicial proceeding," but rather "an alternative thereto." (*Id.* at p. 8.)  However, where arbitration is statutorily mandated as part of a regulatory scheme, it does constitute an "official proceeding authorized by law" within the meaning of the anti-SLAPP statute.  (*Id.* at p. 9; *Mallard v. Progressive Choice Ins. Co.* (2010) 188 Cal.App.4th 531, 538-539 (*Mallard*).)  Thus, arbitration mandated by Insurance Code section 11580.2 qualifies as an official proceeding because that statute requires every automobile liability insurance policy that covers bodily injury to provide coverage for bodily injury damages caused by uninsured motorists and mandates the contractual arbitration of disputes regarding that coverage.  (*Mallard*, at pp. 539-541; see Ins. Code, § 11580.2, subds. (a) & (f).)  Arbitration conducted pursuant to the Mandatory Fee Arbitration Act (§ 6200 et seq.) qualifies as an official proceeding because such arbitration is "established by statute to address a particular type of dispute" and is mandatory for the attorney if the client agrees in writing to arbitration.  (*Philipson & Simon v. Gulsvig* (2007) 154 Cal.App.4th 347, 358 (*Philipson*); § 6200, subd. (c); accord,

15

*Kibler*, *supra*, 39 Cal.4th at pp. 198-200 [peer review proceeding to evaluate the staff privileges of physicians qualifies as an "official proceeding" because it is mandated by statute and subject to judicial review by administrative mandate].)

If a statutorily mandated arbitration proceeding qualifies as an official proceeding, the acts of a party to that proceeding may constitute protected activity. A party's *initiation* of such an official proceeding is certainly protected activity. (*Briggs*, *supra*, 19 Cal.4th at p. 1115 [""'[t]he constitutional right to petition . . . includes the basic act of filing litigation"'"]; *Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1087 ["filing a lawsuit is an exercise of a party's constitutional right of petition"]; see *Philipson*, *supra*, 154 Cal.App.4th at p. 358 [filing cross-complaint].) A party's subsequent acts during the proceeding also qualify. (*Mallard*, *supra*, 188 Cal.App.4th at pp. 539-541 [issuing subpoena in midst of arbitration].) A party's *preceding* acts may also qualify as protected activity if they are "'communications preparatory to or in anticipation of the bringing of an action or other official proceeding.'" (*Briggs*, at p. 1115.) But such preparatory communications do not qualify as a protected activity if future litigation is not anticipated, and is therefore only a "possibility"—and this is true even if the communication is a necessary prerequisite to any future litigation. (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 827-828 (*Anapol*).) Thus, an insured's submission of a claim to an insurance company is usually not protected activity because, absent prior failed negotiations or the like, "the insured will have no reason to believe the claim will be denied and litigation will follow." (*Ibid.*; see also *Beach v. Harco National Ins. Co.* (2003) 110 Cal.App.4th 82, 94 [conduct of

16

insurer in delaying response to claim is not protected activity because it "occurred long before any arbitration or other proceeding commenced"].)

Mission's claims do not involve protected activity for two reasons. First, as we have concluded above, Mission's claims are based upon Pabst's *decision* to terminate the Agreement—not Pabst's subsequent letter communicating that decision. That decision precedes and is unconnected with any official proceeding. Second, even if we were to assume that Mission's claims are premised on Pabst's subsequent letter, that letter does not qualify as protected activity. Although section 25000.2's mandatory arbitration undoubtedly qualifies as an official proceeding under the governing precedent, Pabst's letter is not preparatory to such an arbitration. That is because section 25000.2 first contemplates that the existing distributor and successor brewer's designated distributors negotiate in good faith and resort to arbitration only if negotiations fail. (§ 25000.2, subd. (f).) Like the insured who files a claim not knowing whether the insurer will pay the claim or fight the claim in litigation, Pabst had "no reason to believe" that arbitration "will follow" from its letter because Mission, Classic, and Beauchamp could well have negotiated a settlement and obviated any need for arbitration. (*Anapol, supra*, 211 Cal.App.4th at pp. 827-828.)

For these reasons, the anti-SLAPP statute does not apply.

### B.    Do Mission's Claims Have Minimal Merit?

Pabst further contends that Mission's two claims lack the minimal merit necessary to withstand its anti-SLAPP motion. Specifically, Pabst asserts that Mission cannot prove (1) any breach of contract because section 25000.2 independently confers upon brewers a right to terminate a distribution contract, or

17

(2) any damages arising from any breach because Mission was made whole by Classic's and Beauchamp's payment reflecting the fair market value of Mission's distribution rights. Because any breach of contract claim requires proof of a contractual duty, breach of that duty, causation, and damages (*Oasis West*, *supra*, 51 Cal.4th at p. 821), and because Mission's declaratory relief claim that there was no valid termination in effect seeks a declaration that Pabst breached the contract (Code Civ. Proc., § 1060 [authorizing suit for a "declaration of . . . rights . . . with respect to another"]), Mission is required to make out a prima facie case that Pabst breached the Agreement and that Mission was damaged by that breach. Although the trial court did not evaluate whether Mission's claims had minimal merit, we have the discretion to do so (*Schwarzburd v. Kensington Police Protection & Community Services Dist. Bd.* (2014) 225 Cal.App.4th 1345, 1355; *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 615-616), and will exercise that discretion in this case because the issue is squarely presented and because no California court has construed section 25000.2. We will consider each contested element.

        *1.     Has Mission made a prima facie showing that Pabst breached the Agreement?*

Because Pabst's termination of the Agreement rested solely on its position that section 25000.2 confers upon brewers an independent right to terminate a distribution contract, whether Mission has made out a prima facie case for the element of breach turns on whether section 25000.2 confers such a right. This is a question of statutory interpretation, which we review de novo. (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247.)

18

Our ""fundamental task"" in interpreting a statute is to ""effectuate the law's purpose."" (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616-617, quoting *Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 165-166.) Because the best indicator of our Legislature's intent is found in the words of the statute itself, we start with the statute's plain text. (*Ibid.*) We construe the text ""in the context of the statutory framework as a whole"" and give that text "a plain and commonsense meaning."" (*Id.* at p. 616) Unless a literal reading of the text ""would result in absurd consequences"" or unless the text ""permits more than one reasonable interpretation,"" our inquiry both starts *and stops* with the text. (*Ibid.*) In those limited situations where we look beyond the text, we may also consider ""the statute's purpose, legislative history, and public policy."" (*Id.* at pp. 616-617.)

The text of section 25000.2 sets forth the procedures that must be followed when a "successor beer manufacturer . . . acquires the rights to manufacture . . . a product" and "cancels any of the existing [distributor's] rights to distribute the product." (§ 25000.2, subd. (b)(1) & (2).) The statute prescribes what happens *after* the successor brewer cancels, but nothing in the statute's text expressly grants the successor brewer the precursor right to cancel distribution rights. (Accord, *Maita Distributors, Inc. v. DBI Beverage* (N.D.Cal. 2009) 667 F.Supp.2d 1140, 1147 (*Maita*) ["Nothing in the statutory text [of section 25000.2] expressly grants a right of cancellation"]; *Mussetter Distributing, Inc. v. DBI Beverage Inc.* (N.D.Cal. 2010) 685 F.Supp.2d 1028, 1030 (*Mussetter*) [same].) More to the point, nothing in the statute's text expressly grants the successor beer manufacturer

19

the further right to cancel distribution rights regardless of its contractual obligations with the existing distributor.

Nor can we infer an implied right to cancel distribution contracts—with or without impunity—from section 25000.2's legislative history.  To begin, section 25000.2 was sponsored by the California Beer and Beverage Distributors.  (Assem. Com. on Governmental Organization, Analysis of Sen. Bill No. 574 (2007-2008 Reg. Sess.) June 27, 2007, pp. 3-4 <http://www.leginfo.ca.gov/pub/07-08/bill/sen/sb_0551-0600/sb_574_cfa_20070626_130036_asm_comm.html>).  It seems highly unlikely that an organization representing distributors would sponsor legislation that would deprive their members of their negotiated contractual rights.  Moreover, section 25000.2 was enacted to address a specific problem:  Brewers were buying up and consolidating more and more brands of beer and then seeking to use their own network of distributors, so there was a need for "an authorized and structured process to insure the timely payment of fair and market-based compensation for the transfer of brands between" distributors.  (*Ibid.*; see also Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 574 (2007-2008 Reg. Sess.) as amended Aug. 27, 2007, p. 6 <http://www.leginfo.ca.gov/pub/07-08/bill/sen/sb_0551-0600/sb_574_cfa_20070905_133644_sen_floor.html>.)  Solving this problem does not require brewers to be granted an unvarnished right to terminate their distributorship contracts.  Not surprisingly, the only two decisions to have interpreted section 25000.2—the federal district court decisions in *Maita* and *Mussetter*—have also concluded that section 25000.2 does not expressly or implicitly grant a successor brewer a right to cancel

20

distribution contracts. (*Maita, supra*, 667 F.Supp.2d at pp. 1147-1148; *Mussetter, supra*, 685 F.Supp.2d at p. 1030.)

Pabst concedes that section 25000.2 does not *expressly* confer upon successor brewers an independent right to cancel distributorship without incurring any contractual liability, but offers seven reasons why section 25000.2 *implicitly* confers such a right and why *Maita* and *Mussetter* are both wrongly decided.

First, Pabst asserts that section 25000.2 was designed to facilitate "efficient breaches of contract"—that is, the successor brewers may breach the distributorship contracts as long as their newly designated distributor pays the existing distributor the statutorily mandated fair market value of the transferred distribution rights. Pabst argues that our Legislature's intent to allow for efficient breaches of contract under section 25000.2 is analogous to its intent to allow for such breaches under section 25000.9, the provision requiring brewers to pay an existing manufacturer damages if the brewer "unreasonably" refuses to allow that distributor to transfer its distribution rights to another distributor. (See *Crown Imports, supra*, 223 Cal.App.4th at p. 1407, fn. 14 ["section 25000.9 is simply a manifestation of the doctrine of efficient breach of contract"].) Pabst's argument misapprehends the concept of efficient breach of contract. That concept supports a rule that allows one party to a contract to breach and *pay damages* rather than perform, at least where it is "worth more [to that party] to breach rather than to perform." (*Huynh v. Vu* (2003) 111 Cal.App.4th 1183, 1198-1199.) That concept does *not*, as Pabst seems to suggest, support a rule that allows the breaching party to *avoid* paying damages for breaching the contract by having someone else pay a subset of those damages. Indeed, the *Crown Imports* case looked to the

21

damages amount in section 25000.9 only because the distributorship contract specifically incorporated state statutory law; *Crown Imports* did not purport to effect a wholesale substitution of the statutory measure of damages for the usual damages arising from a breach of contract. (*Crown Imports*, at p. 1407, fn. 14.) Nothing in section 25000.2 prevents a successor brewer, like Pabst, from engaging in an efficient breach of contract by canceling its distributorship contracts; critically, however, nothing in section 25000.2 immunizes a brewer from the full amount of damages it must pay for such an efficient but nevertheless wrongful breach.

Second, Pabst contends that section 25000.2's legislative history requires us to imply that section 25000.2 grants brewers the right to cancel their distributorship contracts and immunity from breach of contract liability when they do so. Pabst points to a number of letters, including a letter from the California Beer and Beverage Distributors, that were submitted to legislators and that stated the authors' view that section 25000.2 "takes the brewer out of the process and effectively out of litigation" and thus "will end brand transfer litigation to the economic benefit of both brewers and California beer distributors."[6] These letters do not support—let alone compel—the conclusion that section 25000.2 gives brewers a "get out of litigation free" card. To begin, these letters reflect the opinions of entities lobbying our Legislature, not the Legislature itself. Moreover, the letters on their face simply recognize that section 25000.2 "takes the brewer out of the process" of negotiating, arbitrating, and if there is an

---

[6] We grant Pabst's request to judicially notice these letters, which are part of section 25000.2's legislative history. (Evid. Code, §§ 452, subd. (c) & 459.)

22

appeal, litigating, the fair market value of the distribution rights; the letters in no way reflect the view that section 25000.2 takes brewers out of *all* litigation, even litigation for violating their contractual obligations. Indeed, the brewer in *Maita* offered the same letters in support of its argument that section 25000.2 conferred a right to cancel contracts and concomitant immunity for doing so; *Maita* concluded that "this snippet of legislative history . . . [was] not sufficient" to support that argument. (*Maita*, *supra*, 667 F.Supp.2d at pp. 1147-1148.)

Third, Pabst notes that section 25000.2 provides that "arbitration" conducted under its auspices "shall be *the* means of determining compensation . . . for the fair market value of the affected distribution rights" (§ 25000.2, subd. (f), italics added), and asserts that the word "the" implies that section 25000.2's remedy is exclusive. But the exclusivity of section 25000.2 regarding the means of fixing damages for the fair market value of distribution rights does not speak to the preceding right to terminate those rights or the right to initiate litigation seeking damages over and above "the fair market value of the affected distribution rights."

Fourth, Pabst argues that the "primary right" theory mandates that section 25000.2 be read to grant a brewer the right to terminate an existing distributorship agreement and to foreclose any lawsuit for breach of the agreement. Otherwise, Pabst explains, the existing distributor will be allowed to impermissibly "split its claim" for damages—getting some damages from the newly designated distributors under section 25000.2's negotiation and arbitration process and some damages from the successor brewer in breach of contract litigation.

23

Pabst overreads the primary right theory. "The primary right theory . . . provides that a 'cause of action' is comprised of a 'primary right' of the plaintiff"; a "primary right" is the "right to be free from the particular injury suffered." (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 681-682.) Because a "primary right" is "'indivisible'" and "'gives rise to but a single cause of action'" (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 904), the doctrine prevents a plaintiff from "split[ting] a single cause of action and try[ing] it piecemeal" (*Ford Motor Co. v. Superior Court* (1973) 35 Cal.App.3d 676, 679; *Mycogen Corp.*, at p. 904 ["'The primary right theory . . . is invoked . . . when a plaintiff attempts to divide a primary right and enforce it in two suits'"]). However, the "'primary right theory has a fairly narrow field of application'" (*Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 642), and as our Supreme Court has observed, is "ill-suited to the anti-SLAPP context" (*Baral*, *supra*, 1 Cal.5th at p. 395).

Although a distributor may have a single primary right— and hence a single claim—not to be injured by a breach of its distribution contract, a distributor does not impermissibly split that claim when it is shunted into a statutorily mandated procedure for evaluating the fair market value of its distribution rights and thereafter files suit for the wrongful breach of that contract to collect damages over and above the fair market value of its rights. *Our Legislature's* decision to create the potential for litigation to occur in two fora is not the *distributor's* decision to split a claim, and thus does not run afoul of the primary right doctrine or require us to construe section 25000.2 to foreclose all attempts by the distributor to seek relief outside the statutorily mandated procedure.

24

Fifth, Pabst argues that section 25000.2 must be read to foreclose any lawsuit by an existing distributor against the brewer because such a lawsuit will always be either unripe or moot. It will be unripe, Pabst claims, until the existing distributor is paid by the newly designated distributors because, until that time, the existing distributor will continue to exercise its distribution rights. (§ 25000.2, subds. (e) & (g).) But once the distributor is paid, Pabst continues, the distributor's lawsuit instantly becomes moot because the payment makes the distributor whole and makes any declaratory relief redress for a "past wrong." (See *Babb v. Superior Court* (1971) 3 Cal.3d 841, 848 [declaratory relief "'operates prospectively, and not merely for the redress of past wrongs"].) This argument is flawed. Pabst is incorrect that a distributor's claim for breach of contract is not ripe as long as it continues to distribute the brewer's beer because, as noted above, the distributor may sue for anticipatory breach. (*Guerrieri*, *supra*, 51 Cal.2d at p. 18; *Ferguson*, *supra*, 197 Cal.App.4th at p. 1168.) Pabst is also incorrect that a distributor's claim is moot once the newly designated distributors remit the fair market value of the distribution rights because, as discussed below, additional damages may be available if there is a wrongful breach and there remains a live "actual controversy" warranting declaratory relief regarding those additional damages and the wrongful breach that caused them.

Sixth, Pabst contends that section 25000.2 must be read to foreclose a distributor's subsequent lawsuit for breach of contract because that lawsuit will always be barred by California's litigation privilege. The litigation privilege "applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to

25

achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.) The privilege applies to communications made in "private arbitration proceedings." (*Moore v. Conliffe* (1994) 7 Cal.4th 634, 645.) The privilege immunizes a defendant from liability for all claims (other than malicious prosecution) based on privileged communications (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 322), including breach of contract claims (*Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1485-1486). However, because, as discussed above, Mission's lawsuit is based upon Pabst's *decision* to terminate the Agreement (and not Pabst's subsequent communication of that decision), Mission's lawsuit is not barred by the litigation privilege. The same would be true for all lawsuits by distributors premised on the successor brewer's decision to breach the distributorship contract, so the litigation privilege does not dictate that we interpret section 25000.2 to bar all distributor lawsuits for breach of contract.

Lastly, Pabst points to the earlier rulings of the trial court and the arbitrator in this case rejecting Mission's entreaties to halt the arbitration. Pabst urges that these rulings stand for the proposition that section 25000.2 forecloses Mission's—and hence, any distributor's—subsequent breach of contract lawsuit. Pabst overreads the prior rulings. Those rulings simply refused to halt the ongoing section 25000.2 proceedings; they said nothing about the viability of Mission's civil lawsuit for damages. Indeed, the arbitrator in his final award went out of his way *not* to foreclose Mission's lawsuit.

For these reasons, we hold that section 25000.2 does not independently confer upon brewers the right to cancel their

26

existing distributorship contracts and does not immunize them from liability for any wrongful cancellation of those contracts.[7] Because Pabst offers no other basis for its decision to terminate the Agreement, Mission has made out a prima facie case that Pabst breached the Agreement.

     2.     *Has Mission made a prima facie showing that Pabst's cancellation of the Agreement caused it damage?*

A plaintiff is entitled only to a "single recovery" for "a distinct harm suffered." (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158-1159; *Renda v. Nevarez* (2014) 223 Cal.App.4th 1231, 1237.) A plaintiff suing for breach of contract is entitled to recover as damages "the amount which will compensate . . . for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.) These damages include: (1) "general damages," which are damages that "flow directly and necessarily from a breach of contract" (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 968 (*Lewis Jorge*), and which include lost profits (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773-774); (2) "special" or consequential damages, which are damages that "do not arise directly and inevitably" but which are recoverable to the extent they "were either actually foreseen . . . or were 'reasonably foreseeable' when the contract was formed" (*Lewis Jorge*, at p. 970); (3) nominal

---

[7]    We accordingly have no occasion to reach Mission's further contention that construing section 25000.2 to immunize successor brewers from breach of contract liability for wrongful termination of distribution contracts would unconstitutionally impair the contract rights of distributors. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)

damages (Civ. Code, § 3360; *Sweet v. Johnson* (1959) 169 Cal.App.2d 630, 632-633); and, if the contract so provides, (4) attorney's fees to the prevailing party (Civ. Code, § 1717; Code Civ. Proc., § 1021).

Given the breadth of damages available when a contract is breached, an existing distributor's receipt of the "fair market value of the affected distribution rights" under section 25000.2 does not necessarily make that distributor whole.  Even if the fair market value provided for by section 25000.2 encompasses the distributor's lost profits (e.g., *Tri County Wholesale v. Labatt USA Operating Co.* (6th Cir. 2016) 828 F.3d 421, 423, 430-431), the distributor may also be entitled to consequential damages arising from a wrongful breach as well as attorney's fees (and, of course, nominal damages).  Nor is there any danger that an existing distributor would be unjustly enriched by receiving duplicative damages because courts can and will offset against any civil jury award amounts that are duplicative of payments made under section 25000.2's procedures.  (E.g., *Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 777 [noting how "the problem of duplicative recoveries could be addressed by allowing damages already paid to be offset"].)

Pabst resists this conclusion with two further arguments.  First, it argues that a distributor would not be entitled to injunctive relief that would unwind the transfer of distribution rights.  However, whether or not section 25000.2 forecloses injunctive relief that would unwind a transfer (a question not before us now), Mission has still made out a cognizable claim for damages and declaratory relief that survives Pabst's anti-SLAPP motion.

Second, Pabst asserts that Mission has adduced insufficient proof of damage because its assertion that it has suffered "approximately $2,500,000 per year" in lost "expected annual gross profits" to its company as a whole—over and above the lost value of its distribution rights—is too "conclusory"; Pabst complains that Mission did not explain how its estimate was calculated. Pabst forfeited this argument by not objecting to this evidence on this basis before the trial court. (Evid. Code, § 353; *Gonzalez v. Santa Clara County Dept. of Social Services* (2017) 9 Cal.App.5th 162, 173.) Even if the objection were not forfeited, the trial court would not have abused its discretion in considering the evidence. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) Although a court "determining whether the plaintiff has made a prima facie evidentiary showing on the second prong of the anti-SLAPP inquiry" should "disregard declarations lacking in foundation or personal knowledge, or that are argumentative, speculative, impermissible opinion, hearsay, or conclusory" (*Dwight R. v. Christy B.* (2013) 212 Cal.App.4th 697, 714), the estimate in this case was provided by Mission's president and was based on his personal knowledge; the president's failure to "show his math" does not render the estimate conclusory.

29

## DISPOSITION

The order is affirmed.  Mission is entitled to its costs on appeal.

**<u>CERTIFIED FOR PUBLICATION.</u>**


_____, J.

HOFFSTADT

We concur:

_____, Acting P. J.

ASHMANN-GERST

_____, J.*

GOODMAN

---

*     Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.